Jessica P. Sam
Ha To Ha
8230 SE Yamhill Street
Portland, OR 97216
Phone: (503) 961-5506
Email: jessicasam555@msn.com

US BANKRUPTCY COURT
DISTRICT OF OREGON

**2013 JUN -4  PM 3: 20**

LODGED____REC'D_____

PAID____DOCKETED____

### UNITED STATES BANKRUTCY COURT
### FOR THE DISTRICT OF OREGON

| | |
|---|---|
| In re | ) | Case No. 13-32107-elp7 |
| Jessica P. Sam & Ha To Ha | ) | |
| *Debtors*, | ) | Motion for Reconsideration |
| | ) | |
| | ) | For the order of relief from |
| | ) | Automatic Stay |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |

### **MOTION FOR RECONSIDERATION ON RULING FOR RELIEF FROM**

### **AUTOMATIC STAY**

COME NOW the Debtors, Jessica P Sam and Ha To Ha is motioning the court to reconsider the ruling made on May 14, 2013 by Judge Dunn, granting relief from automatic stay filed by Deutsche Bank National Trust Company in its Capacity as Indenture Trustee for the Noteholders of Aames Mortgage Investment Trust 2005-2, a Delaware statutory trust. 2006-1 and its successors and assigns, (hereafter "DBNT").

### **FACTS**

1. There was a Motion for Relief (MFR) from Automatic Stay for case # 13-32107-elp7 filed by Lisa McMahon-Myhran representing the above mentioned DBNT on 4/23/2013.

2. The MFR appeared to content the following fatal flaws:

a. In pursuant to ORLR 9010-1(b), Lisa McMahon-Myhran has not filed with the court that she is the appointed attorney of record, therefore, she cannot file for MFR to this chapter 7.

b. There wasn't a Proof of Claim (POC) filed for this case required under FRBP Rule 3001(d). How can DBNT object to debtors' automatic stay if they have not filed such POC?

c. This MRF is very confusing as it indicated 2 Trusts were claiming to lift debtors' automatic stay. See Exhibit #1 on "Notice Of Motion For Relief", first page on item "I" and "II" and second page on item 1 a, listed as "DEUTSCHE BANK NATIONAL TRUST COMPANY in its*, *capacity as indenture trustee for the Noteholders of AAMES MORTGAGE INVESTMENT TRUST 2005-2, a**Delaware statutory trust. 2006-1 and its successors and assigns".

d. The "Trusts" DBNT claimed it's acting on behalf of as "DUTSCHE BANK NATIONAL TRUST COMPANY in its capacity as indentured trustee for the Noteholders of AAMES MORTGAGE INVESTMENT TRUST 2005-2, Delaware statutory trust. 2006-1" did not exist, can't be in existence due to "AAMES MORTGAGE INVESTMENT TRUST 2005-2" is a securitized trust and a mortgage back security, see Exhibit #5. Once the note and deed of trust became part of the Trust, it got converted into a security, it is no longer a secured asset. Therefore, DBNT is making falsified claims and committing fraudulent acts by lifting the automatic stay and attempting to foreclose on the debtors.

e. The issuer of the mortgage back trust-AAMES MORTGAGE INVESTMENT TRUST 2005-2 was organized on May 1 2005 with closing trust date of May 31 2005. The Pooling and Servicing Agreement (PSA) required that all Assignment of DOT be completed within 180 days after the closing date. The purported assignment by DBNT was done on June of 2010, almost 5 years after the date required by the Trust PSA. Therefore, DBNT did not make it into this trust and their purported assignment # 2010-077497 is void ab initio and their right to lift the automatic stay is a nullity.

3. Debtors had submitted an Objection to the MFR on time and had served the opposing parties properly.

4. A "Meet Me" hearing on the Motion to Object to the MFR was landed with Judge Dunn on 5-14-3013 as a "Duty Judge" based on the current Bankruptcy Court open "Judge Schedules" system.

5. During the telephone hearing, Judge Dunn rendered his decision based on the following one sided, irrelevant materials submitted by the alleged creditor for previous bankruptcy chapter 13 case. See Exhibit #2-certified transcripts on Motion for Relief from Stay.

   a. The MFR was granted for cause pursuant to section 362(d)(1), the secured creditor lacks adequate protection of an interest in the property is falsely stated. DBNT is not the secured creditor and have not shown proof that it is the secured creditor.

   b. Judge Dunn indicated debtor Ms. Sam was there to argue through her defense response to the motion but none of the responds got addressed. See Exhibit #3 on answers to Motion for Relief.

   c. On Exhibit #2, page 3 line 23-25 and page 4, line1-4. Where Judge Dunn said "the moving party attached copies of the relevant loan documents to the motion. These included a copy of the original Aames promissory note showing an endorsement in blank and the deed of trust which reflected as the lender the—Aames again but attached was a recorded—copy of a recorded assignment of the deed of trust to Deutsche Bank". The way Judge Dunn spoke did not reflect he was in fully comprehension of the situation and the presented documents raised the following questions;

      I. The copy of the "Original Note" which shown the contract was between Aames Funding Corporation DBA Aames Home Loan and the debtor Ha To Ha. No where it mentioned DBNT.

      II. The Endorsement and Assignment of Notes was not assigned to DBNT and it appeared to have flaws such as there are 2 different dates on it and the signer's authenticity is in questioned. How did an assistant secretary obtain the power to sign off on a promissory note? Where is the true sale and the chain of title recorded in pursuant to UCC 3?

How did DBNT acquired the note? And this allonge page did not appear to be permanently affixed to the "Original Note" as required.

III. Why did the Assignment of Deed Of Trust took place on 6/23/2010 again? If DBNT already claimed that the original note was endorsed to them in 2005.

IV. On Exhibit #4, the declaration in support of Objection to Confirmation Of Plan, paragraph 5 and 6, DBNT claimed to have possession of the "Original Note" dated in 2005 held by Robinson Tait, P.S, DBNT also acknowledged the fact the Deed of Trust was recorded in Multnomah County as recording #2005-074270 in 2005, which is the Original DOT where Aames Funding Corporation DBA Aames Home Loan was the Lender, DBNT then claimed the Deed of Trust was assigned to them as evidenced by the assignment recorded in Multnomah County under recording No. 2010-077497 5 years later in 2010. This is a faulty claim due to the fact that Aames Funding Corporation dba Aames Home Loan is a defunct/dissolved/dead entity as of October 2006, see Exhibit # 11. A dead entity can't assign the alleged note or deed of trust. Also it is DBNT's own admission that the NOTE and DEED OF TRUST is bifurcated (separated), the chain of title is interrupted by DBNT created their own assignment and recorded in Multnomah County Recording Office making their own standing a nullity according to Carpenter v. Longan, 16 Wall. 271, 83 U.S. 271,274, 21 L.Ed. 313 (1872), the U.S. Supreme Court stated "The note and Mortgage (DOT) are inseparable, the former as essential, the latter as an incident. An assignment of the note carries the mortgage with it, while assignment of the latter alone is a nullity."

d. On Exhibit #2, page 4, the transcript of Motion for Relief where Judge Dunn indicated he "re-listened to the February 28th hearing and found the declaration of "Melissa Black" authenticate the subject loan documents which are the same loan documents attached to the motion in this case". Again, this is only a one sided presentment by the alleged creditor's council and the declaration appeared to have fatal flaws.

I.    Melissa Black claimed she is the "Assistant Vice President Servicing for Residential Credit Solution (RCS), an attorney in fact of the loan for DBNT. RCS is not the appointed servicer by the "Original" lender making this "Declaration" void.

II.   There is no true sale or appointment from the original lender-Aames to RCS within the time frame that was allowed per the Pooling and Servicing Agreement when the loan was securitized in 2005. See Exhibit #5 for securitzation.

III.  Melissa Black's Linkedin page See Exhibit #6 shows she is not the "Assistant Vice President-Servicing" but rather she is the Director for Foreclosure and Bankruptcy at RCS.

1. There is no power of attorney attached with the declaration to support her role as an attorney-in fact of the loan for the Movant.

2. The declaration is not based on Melissa Black's firsthand knowledge. The alleged "Original Note" was signed on April 18th and 22nd of 2005. Melissa Black did not join RCS until October 2012.

3. Melissa Black is not the custodian of the papers.

e.  On Exhibit # 2 starting at page 4 line 15 on to page 5 where Judge Dunn's indicated that DBNT had adequately establish standing as a party entitled to object the confirmation. The alleged creditor DBNT claimed they had brought in the "Original Note" but the case was dismissed by the debtor so the questioned Original Note was not presented. There is no adequate evidence that allowed Judge Dunn to render his decisions on DBNT had established standing to lift the motion of automatic stay.

6. See Exhibit # 7, transcript from January 31, 2013 hearing where Judge Dunn said he may grant another chance for debtors to amend the plan after DBNT can prove their standing. Debtor was under the understanding DBNT will prove their standing first then debtor will obtain legal help to amend plan or considered converting to chapter 7 afterward.

7. Debtor filed 2 previous chapter 13 cases due to DBNT, non-judicial foreclosure trustee( Regional Trustee Servicing Corp.) and servicer(RCS) repeatedly violating FDCPA, TILA, RESPA law by not answered debtors' numerous debt validations before proceeding with foreclosures. Debtors are the least sophisticated consumers left with no choice except to file bankruptcies in order to prevent DBNT's wrongful foreclosure attempts. See Exhibit # 8 for numerous disputes sent via registered mails and faxes on requests for validity of debt, violation of Oregon Trust Deed Act and request to verify debt under FDCPA ranging from Oct 14, 2011 to recent April 25, 2013.

8. See Exhibit # 9 where loan servicing company (RCS)'s responds that did not addressed the core issues of debt validation.

9. See Exhibit #10 for Robison Tait's respond referencing debtor's validation. Paragraph 1 line 3. It took more than 1 year to answer debt validation which is a violation of TILA.

10. DBNT is known to commit fraudulent foreclosure attempts thru out the US without proper standing and a few of these acts were stopped by judges. Case # 11C 1950 in United States District Court, Northern District of Illinois, Judge Rebecca Pallmeyer ruled Deutsche Bank National Trust Company lacked standing to foreclose due to the requirements of the PSA & New York Trust Law not being followed. Case # 1:11-cv-01950 Deutsche Bank national Trust Company v. Bodzianowski, case is dismissed with prejudice as to Deutsche Bank lack standing to foreclose. In Deutsche Bank v. Francis, judge ruled Deutsche Bank lacked standing to foreclose.

11. There are similar bankruptcy cases in the West Coast that mirror imaging to the debtor's where the alleged creditors attempting to lift motion on automatic stay and proceed with foreclosure while lacking the standings to do so, or the chain of title is broken and among other issues. The Donald E. McCoy, III vs BNC Mortgage Inc.'s case was granted the motion to dismiss as to the claim for wrongful foreclosure Judge Alley in Oregon. The Rickie Walker case where bankruptcy judge found that there were no evidence the note was transferred into the securitization trust.

WHEREFORE, debtors Jessica P. Sam and Ha To Ha prey this court to grant them the opportunity to overturn Judge Dunn's ruling for lifting the automatic stay and find DBNT has no standing on foreclosure due to DBNT is not the "Original Lender" as the Original lender was ceased to exist in October 2006, AAMES Mortgage Investment Trust 2005-2 has been securitized and resulted as a mortgage back trust which is no longer a secured asset, DBNT does not have a valid contract with debtors, there are issues of material fact with the blank endorsement note as it contains 2 dates, the inauthentic signature, the rubber stamped name of the signee and the DBNT bogus 2010 third party servicer appointed assignment of Deed Of Trust recording interrupted the chain of title and a valid indication by DBNT's own admission that the Note and Deed Of Trust is a nullity by bifurcation(separation).

Date  6/4/13

Respectfully Submitted,

Jessica P. Sam
Ha To Ha
8230 SE Yamhill Street
Portland, OR 97216
503-961-5506

# Exhibit 1

UNITED STATES BANKRUPTCY COURT
DISTRICT OF OREGON

In re ) Case No. __13-32107-elp7__
**JESSICA P SAM and** )
**HA TO HA** ) NOTICE OF MOTION FOR RELIEF
) FROM (Check all that apply):
) ☒ AUTOMATIC STAY IN A **CHAPTER 7/13** CASE
Debtor(s) ) ☐ CHAPTER **13** CODEBTOR STAY

I.   YOU ARE NOTIFIED that a Motion was filed by __DEUTSCHE BANK NATIONAL TRUST COMPANY In Its *__, the moving party, for (Check all that apply):

☒ Relief from the automatic stay protecting the debtor(s) and debtor's property, as provided by 11 USC §362.

☐ Relief from the stay protecting the codebtor, whose name and service address are: _____
**\*capacity as Indenture trustee for the Noteholders of AAMES MORTGAGE INVESTMENT TRUST 2005-2, a \*\*** ,
and codebtor's property as provided by 11 USC §1301.

II.  A copy of the Motion is attached.  The name and service address of the moving party's attorney (or moving party, if no attorney) are: __Lisa McMahon-Myhran, 710 Second Ave., Suite 710, Seattle, WA   98104__
**\*\*Delaware statutory trust. 2006-1 and its successors and assigns**

III. If you wish to resist the Motion, you must, within 14 days of the service date shown below, file the following with the Clerk of the U.S. Bankruptcy Court [NOTE: If you mail the Response to the Court for filing, you must mail it at least 3 days before the filing deadline, unless you use an overnight delivery service, so that it will actually be received at the Court on time]:

A.   A written response that states the facts supporting the opposition to the Motion by filling in the applicable "Response" portions on a copy of the original Motion. [NOTE: If the Response will be electronically filed, the Response must be prepared using the "fillable" pdf version of the original Motion unless the Motion was filed on paper and could not be electronically obtained from the movant];

And B.   A fully completed Notice of Hearing using Local Form #721, including the date and time of the hearing.  Available hearing dates and times are posted on the Court's website at www.orb.uscourts.gov under the "Hearings" heading. If you do not have internet access, please call the Court at (503) 326-1500 or (541) 431-4000 and press "0" to obtain the required forms and hearing information from a Court clerk.

IV.  Failure to Respond and Serve Proper Notice of Hearing.  If you fail to file a timely response and a proper Notice of Hearing, then either:

A.   The automatic stay will expire as to the debtor(s) pursuant to 11 USC §362(e) 30 days after the Motion was originally filed, and/or the stay protecting the codebtor will automatically expire pursuant to 11 USC §1301(d) 20 days after the date the Motion was originally filed;

Or B.   The Court may sign an ex parte order, submitted by the moving party on Local Form #720.90, granting relief from the debtor stay and/or codebtor stay.

Clerk, U.S. Bankruptcy Court
[NOTE: If the 5-digit portion of the Case No. begins with "3" or "4", mail to 1001 SW 5th Ave. #700, Portland OR 97204; OR if it begins with "6" or "7", mail to 405 E 8th Ave #2600, Eugene OR 97401.]

I certify that: (1) The Motion was prepared using the Court's "fillable" PDF version of Local Form #720.80; and (2) that on __04/23/13__ I served copies of this Notice and the Motion on the Debtor(s), any codebtor at the address listed above, Trustee, U.S. Trustee, members of any committee elected pursuant to 11 USC §705, and their respective attorneys.

/s/ Lisa McMahon-Myhran                 000849
Signature of Moving Party or Attorney              (OSB#)

720 (12/1/11)

UNITED STATES BANKRUPTCY COURT
DISTRICT OF OREGON

In re

**JESSICA P SAM and**
**HA TO HA**

Debtor(s)

)    Case No. **13-32107-elp7**
)
)    (CHECK ALL APPLICABLE BOXES)
)    ☒ Ch. 7/13 Motion for Relief from
)        ☒ DEBTOR ☐ Chapter **13** CODEBTOR Stay
)        Filed by Creditor:
)        **DEUTSCHE BANK NATIONAL TRUST \***
)    ☐ *Response to Stay Motion filed by Respondent:*
)    _____

1. **Debt, Default, Other Encumbrances, Description and Value of Collateral** *(To be completed by creditor)*

   a. Description of collateral (car model, year, VIN, property address):
   **8230 SE Yamhill Street, Portland, OR 97216**

   **\*COMPANY In its capacity as indenture trustee for the Noteholders of AAMES MORTGAGE INVESTMENT TRUST 2005-2, a**
   **Delaware statutory trust. 2006-1 and Its successors and assigns**
   b. Amount of debt: $____**258,220.49**____ consisting of principal: $____**195,058.93**____; interest: $____**37,286.16**____; other:
   **Late Charges $2,570.18; Escrow Shortage $6,396.03; Other Fees $16,909.19**

   **This amount does not contain attorney's fees and costs.**
   c. Description, amount and priority of other encumbrances on collateral. If not known, include applicable information from
   debtor's schedules if available on PACER:



   Total debt secured by collateral (total 1.b. + 1.c.): $____**258.220.49**____.

   d. Value of collateral: $____**155,000.00**____.
   Equity in collateral: $____**-115,620.49**____, after deducting $____**12,400.00**____ liquidation costs.

   e. Current monthly payment: $____**1,887.24**____.

   f. If Chapter 13:

   (1) $_____ postpetition default consisting of (e.g., $____ payments, $____ late charges, $____ fees):


   (2) $_____ prepetition default consisting of ☐ amounts specified in proof of claim, or, ☐ consisting of:



   g. If Chapter 7, total amount of default $____**51,180.45**____.

*RESPONSE (Identify specific items disputed and specify what you contend are the pertinent facts including why there is a
postpetition default, if applicable) (to be completed by respondent):*

2. **Relief from stay should be granted because (check all that apply):** *(To be completed by creditor)*
    ☒ Lack of adequate protection because of failure to make sufficient adequate protection payments and lack of a sufficient equity cushion.
    ☐ Lack of insurance on collateral.
    ☒ No equity in the collateral and the property is not necessary for an effective reorganization.
    ☐ Failure of debtor to make Chapter 13 plan payments.
    ☐ Failure of debtor to make payments to secured creditor required by ¶4 of Chapter 13 plan.
    ☐ Other (describe):

*RESPONSE (Specify why relief from stay should be denied. If respondent proposes to cure a postpetition default, detail the cure by attaching a proposed order using Local Form (LBF) #720.90 available at www.orb.uscourts.gov under Rules & Forms/Local Bankruptcy Forms (LBF)) (to be completed by respondent):*

3. **Background** *(To be completed by creditor)*

    a. Date petition filed: __04/08/13__   Current Chapter: __7__ (7 or 13)
       If 13, current plan date _____ Confirmed: ☐Yes ☐No
       If 13, treatment of creditor's prepetition claim(s) in plan:

       If 7, debtor☐has ☒has not stated on Local Form (LBF) #521 or #521.05 that debtor intends to surrender the collateral.

    b. Creditor has a lien on the collateral by virtue of (check all applicable sections and also see ¶6 below):
       ☒ Security agreement, trust deed or land sale contract dated __04/18/05__, and, if applicable, an assignment of said interest to creditor. The security interest was perfected as required by applicable law on __04/27/05__.
       ☐ Retail installment contract dated _____, and, if applicable, an assignment of said interest to creditor. The security interest was perfected on the certificate of title on _____.
       ☐ Other (describe):

*RESPONSE (Identify any disputed items and specify the pertinent facts) (to be completed by respondent):*

4. **Request for Relief from Codebtor Stay** (Only Chapter 13)

    a. _____, whose address is _____
       _____, is a codebtor on the obligation described above, but is not a debtor in this bankruptcy.

    b. Creditor should be granted relief from the codebtor stay because (check all applicable boxes): ☐ codebtor received the consideration for the claim held by creditor, ☐ debtor's plan does not propose to pay creditor's claim in full, ☐ creditor's interest would be irreparably harmed by continuation of the codebtor stay as a result of the default(s) described above and/or ☐ because:

*RESPONSE (Identify any disputed items and specify the pertinent facts) (to be completed by respondent):*

5. **Other Pertinent Information** *(To be completed by creditor, if applicable):*

**Debtor has filed two other bankruptcy cases in the last year in an effort to delay or defraud Creditor. Please see case number 12-38965-rld13 and 12-30053-tmb13.**

*RESPONSE (Identify any disputed items and specify the pertinent facts) (to be completed by respondent):*

6. **Relief Requested (check all applicable sections):** *(To be completed by creditor)*

   ☒ Creditor requests relief from the automatic stay to allow it to foreclose its lien on the above identified collateral, and, if necessary, to take appropriate action to obtain possession of the collateral.

   ☒ Creditor has a security interest in real property and requests relief from stay with respect to an act against such property and that the relief be binding in any other bankruptcy case purporting to affect such real property filed not later than 2 years after the date of the entry of an order granting this motion. (*If you check this box, you must complete ¶5 above to support this request. If you do not do so, the Court will not grant relief binding in any other bankruptcy case.*)

   ☐ Creditor requests that the 14-day stay provided by FRBP 4001(a)(3) be waived based on the following cause:

   ☐ Other (describe and explain cause):

*RESPONSE (Identify any disputed items and specify the pertinent facts. If respondent agrees to some relief, attach a proposed order using Local Form (LBF) #720.90 available at www.orb.uscourts.gov under Rules & Forms/Local Bankruptcy Forms (LBF)) (to be completed by respondent):*

## 7. Documents:

If creditor claims to be secured in ¶3.b. above creditor has attached to and filed with this motion a copy of the documents creating and perfecting the security interest, if not previously attached to a proof of claim.

RESPONDENT requests creditor provide Respondent with the following document(s), if any marked, which are pertinent to this response:

☐ Postpetition payment history.

☐ Documents establishing that creditor owns the debt described in ¶1 or is otherwise a proper party to bring this motion.

☐ Other document(s) (specific description):  .

CREDITOR/ATTORNEY

RESPONDENT **DEBTOR**/ATTORNEY *(by signing, the respondent also certifies that [s]he has not altered the information completed by creditor)*

Signature: **/s/ Lisa McMahon-Myhran** _____

Name:__**Lisa McMahon-Myhran** _____

Address:_**710 Second Ave., Suite 710** _____

_____**Seattle, WA  98104** _____

Email Address:__**lmcmahon@robinsontait.com** _____

Phone No:_**206-654-5529** _____

OSB#:____**000849** _____

Signature:_____

Name:_____

Address:_____

_____

Email Address:_____

Phone No:_____

OSB#:_____

RESPONDENT COɾ ˙       *'by signing,*
*the respondent also*    ˑ   *  ᐟ   J*
*the information completed by crediton,*

Signature:_____

Name:_____

Address:_____

_____

Email Address:_____

Phone No:_____

OSB#:_____

*YOU ARE HEREBY NOTIFIED THAT THE CREDITOR IS ATTEMPTING TO COLLECT A DEBT AND ANY INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE.*

# ADJUSTABLE RATE NOTE

(LIBOR 6 Month Index (As Published In The Wall Street Journal) - Rate Caps)

**THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE AND MY MONTHLY PAYMENT. THIS NOTE LIMITS THE AMOUNT MY INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE I MUST PAY.**

April 18, 2005                                                   IRVINE  ,              California
       [Date]                                        [City]                        [State]

8230 SE Yamhill Street, ·Portland, OR  97216
                        [Property Address]

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $ 202,400.00                    (this amount is called "principal"), plus interest, to the order of the Lender. The Lender is Aames Funding Corporation DBA Aames Home Loan

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

Interest will be charged on unpaid principal until the full amount of principal has been paid. I will pay interest at a yearly rate of                       8.990  %. The interest rate I will pay may change in accordance with Section 4 of this Note.

The·interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

## 3. PAYMENTS

### (A) Time and Place of Payments

I will pay principal and interest by making payments every month.

I will make my monthly payments on the  1st            day of each month beginning on June 1st            ,
2005            . I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. My monthly payments will be applied to interest before principal. If, on
May 1, 2035                           , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my·monthly payments at  Aames Funding Corporation DBA Aames Home Loan, 350 South Grand Avenue, 47th Floor, Los Angeles, CA  90071                                      ,
or at a different place if required by the Note Holder.

### (B) Amount of My Initial Monthly Payments

Each of my initial monthly payments will be in the amount of U.S. $ 1,627.10                    . This amount may change.

### (C) Monthly Payment Changes

Changes in my monthly payment will reflect changes in the unpaid principal of my loan and in the interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 of this Note.

## 4. INTEREST RATE AND MONTHLY PAYMENT CHANGES

### (A) Change Dates

The interest rate I will pay may change on the  1st      day of      May              ,  2007    , and on that day every 6th            month thereafter. Each date on which my interest rate could change is called a "Change Date."

**OREGON ADJUSTABLE RATE NOTE - LIBOR 6 MONTH INDEX (AS PUBLISHED IN THE WALL STREET JOURNAL) -** Single Family

AP838OR (0101)
VMP MORTGAGE FORMS (800)521-7291
Page 1 of 4                           Initials: _____

### (B) The Index

Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the average of interbank offered rates for 6 month U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in *The Wall Street Journal*. The most recent Index figure available as of the first business day of the month immediately preceding the month in which the Change Date occurs is called the "Current Index. "

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

### (C) Calculation of Changes

Before each Change Date, the Note Holder will calculate my new interest rate by adding  Six and 350 Thousandths
percentage point(s) (                    6.350%) to the Current
Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

### (D) Limits on Interest Rate Changes

The interest rate I am required to pay at the first Change Date will not be greater than                    11.990 % or less than                    8.990  %. Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than      One
percentage point(s) (                    1.000 %) from the rate of interest I have been paying for the preceding      Six
months. My interest rate will never be greater than                    14.990 % or less than
8.990 %.

### (E) Effective Date of Changes

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

### (F) Notice of Changes

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given me and also the telephone number of a person who will answer any question I may have regarding the notice.

## 5. BORROWER'S RIGHT TO PREPAY

I have the right to make payments of principal at any time before they are due. A payment of principal only is known as a "prepayment." When I make a prepayment, I will tell the Note Holder in writing that I am doing so.

Except as provided below, I may make a full prepayment or partial prepayments without paying any prepayment charge. The Note Holder will use all of my prepayments to reduce the amount of principal that I owe under this Note. If I make a partial prepayment, there will be no changes in the due dates of my monthly payments unless the Note Holder agrees in writing to those changes. My partial prepayment may reduce the amount of my monthly payments after the first Change Date following my partial prepayment. However, any reduction due to my partial prepayment may be offset by an interest rate increase.

However, if within the first      2    years after the execution of the Deed of Trust, I make any prepayments(s) of principal, whether voluntarily, involuntarily, or upon acceleration of the Note within any 12-month period the total amount of which exceeds twenty percent (20%) of the original principal amount of this loan, I will pay a prepayment charge in an amount equal to the payment of six (6) months' advanced interest on the amount by which the total of my prepayment(s) within that 12-month period exceeds twenty percent (20%) of the original principal amount of the loan.

## 6. LOAN CHARGES

This Note shall be governed by the laws of the State of Oregon. If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (i) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (ii) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the principal I owe under this Note or by making a direct payment to me. If a refund reduces principal, the reduction will be treated as a partial prepayment.

## 7. BORROWER'S FAILURE TO PAY AS REQUIRED

### (A) Late Charges for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of Fifteen

calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be                 5.000   % of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

### (B) Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

### (C) Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of principal that has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is delivered or mailed to me.

### (D) No Waiver By Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

### (E) Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

## 8. GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Unless the Note Holder requires a different method, any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

## 9. OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

## 10. WAIVERS

I and any other person who has obligations under this Note waive the rights of presentment and notice of dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

Initials:

## 11. UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses that might result if I do not keep the promises that I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** If all or any part of the Property or any interest in it is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by federal law as of the date of this Security Instrument. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by applicable law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)
Ha  To  Ha                        -Borrower

_____ (Seal)
                                  -Borrower

_____ (Seal)
                                  -Borrower

_____ (Seal)
                                  -Borrower

*[Sign Original Only]*

## Endorsement and Assignment of Note

Re: Loan No. _____ _____                                          Date  04/22/05

Borrower's Name: __Ha To Ha__

Property Address: __8230 SE Yamhill Street__

                __Portland, OR   97216__

Note Date: _____

Loan Amount: __$202,400.00__

Los Angeles, California

For value received, I hereby transfer, endorse and assign to _____ the within Note and
Deed of Trust securing the same, so far as the same pertains to said Note, without recourse.

                                  Aames Funding Corporation, DBA Aames Home Loan

X_____                                          X_____
 ,Assistant Secretary                                                       ,Assistant Secretary

**Thuytien Phung**

AC702803.DOC (08/98)

qs
ﬦ⁵
ʔ

Until a change is requested all tax statements shall be
sent to the following address.
Aames Funding Corporation DBA
Aames Home Loan
350 South Grand Avenue
Los Angeles, CA 90071
**WHEN RECORDED MAIL TO**

Recorded in MULTNOMAH COUNTY, OREGON
    C. Swick,   Deputy Clerk         **ATTDS**
C18    19
Total :         111.00

2005-074270      04/27/2005 02:37:12pm

TransUnion Settlement Solutions, Inc.
Attn: Recording Department
5300 Brandywine Parkway
Suite 100
Wilmington, DE   19803

**TAX ACCOUNT NUMBER**
R281439

———————————————— [Space Above This Line For Recording Data] ————————————————

# DEED OF TRUST

**DEFINITIONS**

Words used in multiple sections of this document are defined below and other words are defined in Sections
3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided
in Section 16.

(A) "Security Instrument" means this document, which is dated   April 18, 2005
together with all Riders to this document.
(B) "Borrower" is   HA TO HA

Borrower is the trustor under this Security Instrument.
(C) "Lender" is   Aames Funding Corporation DBA Aames Home Loan

Lender is a    Corporation
organized and existing under the laws of   The State of California

ⳆⱤⴱⱯⰟⴖ-Single Family-Fannie Mae/Freddie Mac Unif Unm INSTRUMENT                    Form 3038 1/01

**ⱲⰔ**-6(OR) (0104)
Page 1 of 15   UM50 0104.02   Initials:
VMP MORTGAGE FORMS - (800)521-7291





FIDELITY NATIONAL TITLE CO.  03 - 31|2713

Lender's address is 350 South Grand Avenue, 42nd Floor, Los Angeles, CA
90071

Lender is the beneficiary under this Security Instrument.

(D) "Trustee" is Lindsay Harte Law Office

(E) "Note" means the promissory note signed by Borrower and dated April 18, 2005
The Note states that Borrower owes Lender Two Hundred Two Thousand Four Hundred
and No/100 Dollars

(U.S. $ 202,400.00 ) plus interest. Borrower has promised to pay this debt in regular Periodic
Payments and to pay the debt in full not later than May 1, 2035

(F) "Property" means the property that is described below under the heading "Transfer of Rights in the
Property."

(G) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges
due under the Note, and all sums due under this Security Instrument, plus interest.

(H) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following
Riders are to be executed by Borrower [check box as applicable]:

| [X] Adjustable Rate Rider | [ ] Condominium Rider | [ ] Second Home Rider |
|---|---|---|
| [ ] Balloon Rider | [ ] Planned Unit Development Rider | [ ] 1-4 Family Rider |
| [ ] VA Rider | [ ] Biweekly Payment Rider | [ ] Other(s) [specify] |

(I) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations,
ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final,
non-appealable judicial opinions.

(J) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other
charges that are imposed on Borrower or the Property by a condominium association, homeowners
association or similar organization.

(K) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check,
draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument,
computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an
account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine
transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(L) "Escrow Items" means those items that are described in Section 3.

(M) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by
any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i)
damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property;
(iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or
condition of the Property.

(N) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the
Loan.

(O) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the
Note, plus (ii) any amounts under Section 3 of this Security Instrument.

(P) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its
implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time,
or any additional or successor legislation or regulation that governs the same subject matter. As used in this
Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard

DOC 42

-6(OR) (0104)               Page 2 of 15               Initials:               Form 3038 1/01

to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(Q) **"Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

### TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the County of MULTNOMAH                                                              :

[Type of Recording Jurisdiction]                          [Name of Recording Jurisdiction]

As per Exhibit A attached hereto and made a part hereof

which currently has the address of

8230 SE`Yamhill Street                                                                    [Street]

Portland                                          [City], Oregon 97216          [Zip Code]

("Property Address"):

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1. **Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S.

-6(OR) (0104)                          Page 3 of 15                    Initials: ___          Form 3038 1/01

currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees and Assessments, if any, be escrowed by Borrower, and such dues, fees, and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower

shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10

days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to

**-6(OR)** (0104)

Page 6 of 15

Initials

Form 3038 1/01

Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of·or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable

**-6(OR)** (0104)                                    Page 7 of 15                                          Form 3038 1/01

attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10. Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

12. Borrower Not Released; Forbearance By Lender Not a Waiver. Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender

-6(OR) (0104)                    Page 9 of 15          Initials: _____          Form 3038  1/01

to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

13. Joint and Several Liability; Co-signers; Successors and Assigns Bound. Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

14. Loan Charges. Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

15. Notices. All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

16. **Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

17. **Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

18. **Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

19. **Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

20. **Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a

Description: Multnomah,OR Document-Year.DocID 2005.74270 Page: 11 of 19
Order: 100361229 Comment:

notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. **Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold and shall cause such notice to be recorded in each county in which any part of the Property is located. Lender or Trustee shall give notice of sale in the manner prescribed by Applicable Law to Borrower and to other persons prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

23. Reconveyance. Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Such person or persons shall pay any recordation costs. Lender may charge such person or persons a fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law.

24. Substitute Trustee. Lender may from time to time remove Trustee and appoint a successor trustee to any Trustee appointed hereunder. Without conveyance of the Property, the successor trustee shall succeed to all the title, power and duties conferred upon Trustee herein and by Applicable Law.

25. Attorneys' Fees. As used in this Security Instrument and in the Note, attorneys' fees shall include those awarded by an appellate court.

26. Protective Advances. This Security Instrument secures any advances Lender, at its discretion, may make under Section 9 of this Security Instrument to protect Lender's interest in the Property and rights under this Security Instrument.

27. Required Evidence of Property Insurance.

**WARNING**

Unless you provide us with evidence of the insurance coverage as required by our contract or loan agreement, we may purchase insurance at your expense to protect our interest. This insurance may, but need not, also protect your interest. If the collateral becomes damaged, the coverage we purchase may not pay any claim you make or any claim made against you. You may later cancel this coverage by providing evidence that you have obtained property coverage elsewhere.

Initials _____

-6(OR) (0104)

Form 3038 1/01

Description: Multnomah,OR Document-Year.DocID 2005.74270 Page: 13 of 19
Order: 100361229 Comment:

You are responsible for the cost of any insurance purchased by us. The cost of this insurance may be added to your contract or loan balance. If the cost is added to your contract or loan balance, the interest rate on the underlying contract or loan will apply to this added amount. The effective date of coverage may be the date your prior coverage lapsed or the date you failed to provide proof of coverage.

The coverage we purchase may be considerably more expensive than insurance you can obtain on your own and may not satisfy any need for property damage coverage or any mandatory liability insurance requirements imposed by Applicable Law.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____          _____(Seal)
                                          Ha To Ha                -Borrower

                                          _____(Seal)
_____                                   -Borrower

_____(Seal)             _____(Seal)
                    -Borrower                                     -Borrower

_____(Seal)             _____(Seal)
                    -Borrower                                     -Borrower

_____(Seal)             _____(Seal)
                    -Borrower                                     -Borrower

STATE OF OREGON, *Multnomah* County ss:

On this *2157* day of *April 2005*, personally appeared the above named

Ha To Ha

and acknowledged the foregoing instrument to be his/her/their voluntary act and deed.

My Commission Expires: *1/5/08*

(Official Seal)

OFFICIAL SEAL
L. HARKLESS
NOTARY PUBLIC-OREGON
COMMISSION NO. 375355
MY COMMISSION EXPIRES JANUARY 5, 2008

Before me: *L. Harkless*

*L. Harkless*

Notary Public for Oregon

-6(OR) (0104)          Page 15 of 15          Initials          Form 3038  1/01

# ADJUSTABLE RATE RIDER
### (LIBOR 6 Month Index (As Published In The Wall Street Journal) - Rate Caps)

THIS ADJUSTABLE RATE RIDER is made this   18th     day of   April    ,
2005    , and is incorporated into and shall be deemed to amend and supplement the Mortgage,
Deed of Trust or Security Deed (the "Security Instrument") of the same date given by the undersigned (the
"Borrower") to secure Borrower's Adjustable Rate Note (the "Note") to   Aames Funding
Corporation DBA Aames Home Loan

(the "Lender") of the same date and covering the Property described in the Security Instrument and
located at:

8230 SE Yamhill Street, Portland, OR  97216

[Property Address]

**THE NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN THE
INTEREST RATE AND THE MONTHLY PAYMENT. THE NOTE LIMITS THE
AMOUNT THE BORROWER'S INTEREST RATE CAN CHANGE AT ANY
ONE TIME AND THE MAXIMUM RATE THE BORROWER MUST PAY.**

**ADDITIONAL COVENANTS.** In addition to the covenants and agreements made in the Security
Instrument, Borrower and Lender further covenant and agree as follows:

**A. INTEREST RATE AND MONTHLY PAYMENT CHANGES**

The Note provides for an initial interest rate of                 8.990 %. The Note provides for
changes in the interest rate and the monthly payments, as follows:

**4. INTEREST RATE AND MONTHLY PAYMENT CHANGES**

    (A) Change Dates

The interest rate I will pay may change on the   1st     day of  May       ,  2007   ,
and on that day every   6th     month thereafter. Each date on which my interest rate could change
is called a "Change Date."

    (B) The Index

Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the
average of interbank offered rates for 6 month U.S. dollar-denominated deposits in the London market
("LIBOR"), as published in The Wall Street Journal. The most recent Index figure available as of the first
MULTISTATE ADJUSTABLE RATE RIDER-LIBOR 6 MONTH INDEX (AS PUBLISHED IN THE WALL STREET
JOURNAL) -Single Family

-AS838U (9705)    DOC         PPI
Page 1 of 3          Initials:
ELECTRONIC LASER FORMS, INC. - (800)327-0545

business day of the month immediately preceding the month in which the Change Date occurs is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new Index that is based upon comparable information. The Note Holder will give me notice of this choice.

(C) Calculation of Changes

Before each Change Date, the Note Holder will calculate my new interest rate by adding Six and 350 Thousandths                                                    percentage point(s)
(                              6.350 %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

(D) Limits on Interest Rate Changes

The interest rate I am required to pay at the first Change Date will not be greater than
                11.990 % or less than                                    8.990 %. Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than   One

percentage point(s)
(                              1.000 %) from the rate of interest I have been paying for the preceding  6       months.
My interest rate will never be greater than                 14.990 % or less than                          8.990 %.

(E) Effective Date of Changes

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

(F) Notice of Changes

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given me and also the telephone number of a person who will answer any question I may have regarding the notice.

B. TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER Uniform Covenant 17 of the Security Instrument is amended to read as follows:

Transfer of the Property or a Beneficial Interest in Borrower. If all or any part of the Property or any interest in it is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by federal law as of the date of this Security Instrument. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender

**-AS838U** (9705)

Page 2 of 3

Initials: ____

information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by applicable law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider.

| | | |
|---|---|---|
| _____ (Seal) | | _____ (Seal) |
| Ha To Ha           -Borrower | | -Borrower |
| _____ (Seal) | | _____ (Seal) |
| -Borrower | | -Borrower |
| _____ (Seal) | | _____ (Seal) |
| -Borrower | | -Borrower |
| _____ (Seal) | | _____ (Seal) |
| -Borrower | | -Borrower |

-AS838U (9705)

Page 3 of 3

o

## EXHIBIT "ONE"

The East 10.52 feet of Lot 5, and all of Lots 6,7 and 8, Block 5, SUNRISE PARK, in the City of Portland, County of Multnomah and State of Oregon.

53

When recorded, mail to:

**RESIDENTIAL CREDIT SOLUTIONS**
Attn: Foreclosure Department
4282 N FREEWAY
FORT WORTH, TEXAS 76137

**Multnomah County Official Records**
**C Swick, Deputy Clerk**                    **2010-077497**

**$41.00**

0068516020100077497002 0025

**06/23/2010 01:27:43 PM**

1H-MTG ASGT              Cnt=1 Stn=43 ATRGW
$10.00 $11.00 $15.00 $5.00

Trustee's Sale No: 09-FAA-96724

## *FAA967240112000000*

### ASSIGNMENT OF DEED OF TRUST

FOR VALUE RECEIVED, the undersigned, AAMES FUNDING CORPORATION DBA AAMES HOME
LOAN, by these presents, grants, bargains, sells, assigns, transfers and sets over unto DEUTSCHE
BANK NATIONAL TRUST COMPANY in its capacity as indenture trustee for the Noteholders of AAMES
MORTGAGE INVESTMENT TRUST 2005-2, a Delaware statutory trust., 4282 N Freeway, Fort Worth,
TX 76137, all beneficial interest under that certain Deed of Trust dated 4/18/2005, and executed by HA
TO HA, as Grantor, to LINDSAY HARTE LAW OFFICE, as Trustee, and recorded on 4/27/2005, under
Auditor s File No. 2005-074270, of MULTNOMAH County, State of OREGON, and covering property
more fully described on said Deed of Trust referred to herein.

Together with the Note or Notes therein described or referred to, the money due and to become due
therein with interest, and all rights accrued or to accrue under said Deed of Trust.

1                                    Assn



Trustee's Sale No: 09-FAA-96724

Dated: 6/18/10

AAMES FUNDING CORPORATION DBA AAMES
HOME LOAN

BY: _____
Name    Jeffrey W. Gideon
        Vice President
        Title

STATE OF **Texas**
**Tarrant** ) ss.
COUNTY OF _____ )

On 6/18/10 , before me, Amy McQueen, Notary Public
personally appeared **Jeffrey W. Gideon** , who proved to me on the basis of
satisfactory evidence to be the person(s) whose name is/are subscribed to the within instrument and
acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies) and
that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the
person(s) acted executed the instrument.

WITNESS my hand and official seal.

_____
NOTARY PUBLIC, in and for the State of
**Texas** , residing at **Tarrant**
My commission expires: 8/28/12



2                                                    Assn

# Exhibit 2

UNITED STATES BANKRUPTCY COURT

DISTRICT OF OREGON

In re:                        )
                              )
JESSICA P. SAM and            ) Case No.
HA TO HA,                     ) 13-32107-elp7
                              )
        Debtors.              ) PORTLAND, OR
                              ) May 14, 2013
                              ) 1:44 p.m.
                              )
                              ) Motion for Relief from
                              ) Stay Deutsche Bank
                              ) National Trust Company
_____)

# ORIGINAL

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE RANDALL L. DUNN
United States Bankruptcy Judge


APPEARANCES OF COUNSEL:

For Debtor            Mr. Ha To Ha and
(Pro Se)              Ms. Jessica Sam
                      8230 Southeast Yamhill Street
                      Portland, Oregon   97216

Trustee               Mr. Kenneth S. Eiler
                      ATTORNEY AT LAW
                      515 Northwest Saltzman Road
                      Portland, Oregon   97229

For Creditor          Ms. Lisa M. McMahon-Myhran
Deutsche Bank         ROBINSON TAIT, PS
National Trust        710 Second Avenue
Company               Suite 710
                      Seattle, Washington   98104

*Capri Iverson*

Certified Freelance Reporters

1819 SW 18th Avenue · Portland OR, 97205
503.279.4044  800.990.2829

```
 1                    P R O C E E D I N G S
 2
 3                 JUDGE DUNN:  Jessica Sam and Ha to Ha.
 4                 MS. McMAHON-MYHRAN:  Lisa McMahon for
 5    Deutsche Bank, Your Honor.
 6                 JUDGE DUNN:  All right.  I'm sure the
 7    parties are aware that this one comes to me with a
 8    history.
 9                 MS. McMAHON-MYHRAN:  That's correct,
10    Your Honor.  I was going to raise that issue.
11                 JUDGE DUNN:  Well -- and this is the
12    third bankruptcy case involving Mr. Ha.  I'm
13    assuming Ms. Ha --
14                 Ms. Sam, you are Mr. Ha's wife?
15                 MS. SAM:  Yes, that's correct.
16                 JUDGE DUNN:  All right.  There were two
17    prior Chapter 13 cases for Mr. Ha.  In the first
18    one which was Judge Brown's case, it was dismissed
19    for failure to file an amended plan as ordered.
20                 The second Chapter 13 case was mine,
21    and ultimately at the time of an evidentiary
22    hearing, it was dismissed on the debtor's oral
23    motion after we had a colloquy and determined that
24    the debtor could not propose a confirmable plan in
25    Chapter 13.
```

1          Now, I'm going to get back to that
2   because the evidence presented at that hearing and
3   the situation of the prior case are relevant to the
4   current case.  I would simply note at this point
5   that that hearing was held on February 28th of this
6   year, and the case was dismissed virtually
7   immediately thereafter.

8          So now we come to the current Chapter 7
9   case that is Judge Perris' case, but since I'm the
10  duty judge on relief from stay, I'm hearing it at
11  this point.

12         The case was filed.  No motion was
13  filed to extend the stay.  So because Mr. Ha had a
14  case pending that was dismissed on his oral motion
15  within a year, the stay terminated as to Mr. Ha.
16  He has no stay.

17         Ms. Sam is here for the first time, and
18  her defense response to the motion is to argue that
19  the moving party, Ms. McMahon-Myhran's client, has
20  no standing.

21         Now, when the motion was filed in this
22  case, the moving party attached copies of the
23  relevant loan documents to the motion.  These
24  included a copy of the original Aames' promissory
25  note showing an endorsement en banc and the deed of

1  trust which reflected as the lender the -- Aames
2  again but attached was a recorded -- copy of a
3  recorded assignment of the deed of trust to
4  Deutsche Bank.
5          Now, in spite of the debtors' arguments
6  that there's no evidence as to standing, I, of
7  course, having remembered this case, took a look at
8  the docket in the prior case and actually listened
9  to the recording of the February 28th hearing.  In
10 support of Deutsche Bank's objection to
11 confirmation in that case, Ms. McMahon-Myhran filed
12 the declaration of Melissa Black to authenticate
13 the subject loan documents which are the same loan
14 documents attached to the motion in this case.
15         I advised the parties at the hearing on
16 the objection to confirmation in the prior Chapter
17 13 case that the evidence submitted by the bank was
18 adequate to establish Deutsche Bank's standing as a
19 party entitled to object to confirmation.  And that
20 documentation also is adequate to establish
21 standing to file a motion for relief from stay.
22         I further note that, at the time of the
23 February 28th hearing, counsel for Deutsche Bank
24 appeared in court and advised through the courtroom
25 deputy that they had the original promissory note

```
 1   with them that they were ready to submit in
 2   evidence.
 3              So the arguments that they have no
 4   standing, particularly since, in order to obtain
 5   relief from stay a creditor only has to establish a
 6   colorable claim which is that they have some claim
 7   to the property that ultimately, if it's litigated
 8   under state law, may or may not be successful but
 9   apparently gives them a position of interest with
10   respect to the property subject as the right to
11   (inaudible) the subject (inaudible) --
12              MS. SAM:  Your Honor, I'm having
13   trouble -- I'm having difficulty hearing you.
14              And then I object.
15              JUDGE DUNN:  Well, if you -- if you
16   need a recording of the hearing, you may obtain one
17   by requesting one from my courtroom deputy.
18              But based on the foregoing information,
19   I find that Deutsche Bank has standing to file --
20              MS. SAM:  Your Honor, I object.
21              JUDGE DUNN:  -- and prosecute a --
22   well, I under- --
23              MS. SAM:  Your Honor --
24              JUDGE DUNN:  I understand that you
25   object.
```

1             I am making my findings that they have
2   standing to file and prosecute a motion for relief
3   from stay.  Neither Ms. Sam nor Mr. Ha have
4   controverted the amount alleged in default.  And
5   this is a Chapter 7 case which is not a
6   reorganization case under the Bankruptcy Code.
7             So in light of the foregoing findings,
8   I am going to grant Deutsche Bank's motion for
9   relief from stay at this preliminary hearing for
10  cause pursuant to Section 362(d)(1) of the
11  Bankruptcy Code.
12            And, Ms. McMahon-Myhran, you may submit
13  an order to that effect which I will sign.
14            MS. McMAHON-MYHRAN:  Thank you, Your
15  Honor.
16            JUDGE DUNN:  You're welcome.
17            MS. SAM:  I object to it because the --
18  the -- the promissory note that they said that they
19  have and the recording did not happen after five
20  years of the original recording.
21            JUDGE DUNN:  You know, Ms. Sam, your
22  remedy at this point is to appeal my ruling.
23            MS. SAM:  Okay.
24            JUDGE DUNN:  I have ruled.  I am
25  granting relief from stay for cause based on the

1  record before me in this case and the record that

2  was presented in the prior Chapter 13 case in

3  number 12-38965-rld13.

4          MS. McMAHON-MYHRAN:  Your Honor, are

5  you also making a ruling in rem request in our

6  motion or simply on (d)(1)?

7          JUDGE DUNN:  (d)(1).  I'm not making a

8  ruling on in rem.  If -- if you want an in rem

9  ruling, you'll have to request an evidentiary

10 hearing before Judge Perris.

11         MS. McMAHON-MYHRAN:  Thank you.

12         JUDGE DUNN:  You're welcome.

13         I never do in rem without an

14 evidentiary hearing.

15         Any other questions?

16         MS. McMAHON-MYHRAN:  No.  Thank you,

17 Your Honor.

18         JUDGE DUNN:  Thank you very much.

19         MS. McMAHON-MYHRAN:  Bye.

20

21         (The proceedings concluded at

22          1:52 p.m.)

23

24

25

1                          C E R T I F I C A T E

2                                              **ORIGINAL**

3                          I, Shellene L. Iverson, a Certified

4    Shorthand Reporter in and for the state of Oregon,

5    hereby certify that I transcribed all testimony

6    adduced and other oral proceedings had in the

7    foregoing matter from the FTR recording made at the

8    time of proceedings.  The foregoing transcript,

9    pages 2 through 7, constitutes a full, true, and

10   accurate record of such testimony adduced and other

11   oral proceedings had and the whole thereof to the

12   best of my knowledge, ability, and belief.

13                          Witness my hand and seal at

14   Milwaukie, Oregon, this 20th day of May 2013.

15

16

17                                  Shellene L.  Iverson
18                                  Certified Shorthand Reporter
                                    Certificate No.  03-0386
19

20

21

22

23

24

25

# Exhibit 3

In respond to "MOTION FOR RELIEF FROM AUTOMATIC STAY" in Chapter 7 case # 13-32107-elp7.

In answering paragraph 1, debtors deny the alleged amount or the validity of the debt entered by DEUTSCHE BANK NATIONAL TRUST COMPANY (DBNT) in paragraph 1, due to DBNT did not loan any money to debtors and never had any actual interest in the mortgage. The Deed of Trust was not given for the benefit of DBNT and DNBT has never been named the beneficiary to the trust.

In answering paragraph 2, Debtors deny the allegation and object to "Relief from Stay" due to DBNT is not the true party of interest to collect payments. DBNT is not and has never been the beneficiary to the trust, therefore, DBNT is not entitled to receive payments and not authorized to question the equity in the collateral.

In answering paragraph 3, debtors deny the allegation that DBNT has any security agreement between itself and the debtor, debtors deny the allegation that DBNT has the proper recorded loan assignment naming them on the deed of trust on 4/27/05, or land sale contract dated 4/18/05 to authorize them as "secured creditor" to have any saying or lifting debtors (home owners) automatic stay. DBNT has no right or authority to challenge whether or not the debtors have not stated on Local Form (LBF) #521 or #521.05 for intends to surrender the collateral.

In answering paragraph 5, debtors had filed 2 bankruptcies in order to prevent the wrongful foreclosures that the allege creditor (DBNT) have maliciously conducted through their appointed trustee RTSC for foreclosure non-judicially. 12-30053-tmb13 was filed on 1/5/2012 and 12-38965-rld13 was filed on 12/6/2012 to prevent fraudulent/wrongful foreclosure. There were many correspondences sent by the debtors for verification, validation of the debt and even notices of violation of Oregon Law and Federal Statute if proceed with foreclosure. All these were sent to the parties that have control of the outcome of the foreclosure such as the alleged loan servicer (RCS), the alleged trustee that handled the non-judicial sale (Regional Trustee Corp.) and Robinson Tait, the attorney law firm claimed they represent RCS and the alleged creditor (DBNT). Debtor filed the mentioned 2 chapter 13 to prevent the wrongful foreclosures from taken place.

In answering paragraph 6, debtor is objecting the alleged creditor's request for relief from the automatic stay due to DBNT is not the true creditor to debtor's lien/collateral. The alleged creditor has not established itself as having any secured interests in the real property, nor has any indication that they are a named party with authority on debtor's deed of trust. Wherefore, the alleged creditor (DBNT) should not have the authority to request relief from stay.

# Exhibit 4

1  Lisa McMahon-Myhran, OSB#00084
   Robinson Tait, P.S.
2  710 Second Avenue, Suite 710
3  Seattle, WA 98104
   Phone: (206) 676-9640
4  lmcmahon@robinsontait.com

5

6              UNITED STATES BANKRUPTCY COURT
                  FOR THE DISTRICT OF OREGON
7                       AT PORTLAND

8

9  In Re:                              | Case No.: 12-38965-rld13

10 HA TO HA                            | DECLARATION    IN    SUPPORT    OF
11                                     | OBJECTION TO CONFIRMATION OF PLAN

12

13

14  ____Melissa Black_____, being first duly sworn on oath, deposes and states as follows:

15

16 1. I am over the age of eighteen and am authorized to make this declaration on behalf of DEUTSCHE
      BANK NATIONAL TRUST COMPANY in its capacity as indenture trustee for the Noteholders of
17    AAMES MORTGAGE INVESTMENT TRUST 2005-2, a Delaware statutory trust ("Movant").

18 2. I am presently a Assistant Vice President Servicing for Residential Credit Solutions, ("Residential") servicer and
      attorney in fact of the loan for Movant. If sworn as a witness I can competently testify to the matters
19    stated herein. The statements set forth in this Declaration are true and correct to the best of my
20    knowledge and belief.

21 3. In the regular performance of my job functions, I am familiar with the business records as
      maintained by Residential for the purpose of servicing mortgage loans. These records (which
22    typically include data compilations, electronically imaged documents, and others) are made at or
23    near the time by, or from information provided by, persons with knowledge of the activity and
      transactions reflected in such records, and are kept in the course of business activity conducted
24    regularly by Residential. It is the regular practice of Residential's mortgage servicing business to
      make and update these records. In connection with making this affidavit, I have personally
25    examined these business records reflecting data and information of HA TO HA.

26

27 4. Movant is the holder of and in possession of a note ("Note") for this Loan, bearing the date of
   Declaration- 1 -
28 60410-0168-BK-2\

                                                    Law Offices
                                    ROBINSON TAIT, P.S.
                                    710 Second Avenue, Suite 710
                                    Seattle, Washington 98104

1    April 18, 2005, in which the Debtor(s) **HA TO HA** promised to pay the sum of $202,400.00.  A

2    true and correct copy of said Note is attached hereto as Exhibit "A."

3   5. **The original Note is currently held at** _Robinson Tait, P.S._ .

4   6. The Note is secured by a deed of trust on real estate together with all improvements thereon,

5     located at 8230 SE Yamhill ST, Portland, OR 97216.  The Deed of Trust was recorded in

     Multnomah County as recording #2005-074270.  The Deed of Trust was assigned to Movant, as

6     evidenced by the assignment recorded in Multnomah County under recording No. 2010-077497.

7     See Exhibits "B" and "C" attached.

8   7. The debtor is currently contractually delinquent on the Note for the February 1, 2011 payment.

     The total pre-petition arrearage is $52,678.14.

9

10   I declare under penalty of perjury that the foregoing is true and correct and that this declaration was

11   executed at <u>Fort Worth, TX</u>      on <u>February</u>  <u>22</u> ,<u>2013</u>   .

12

13

14                 _Melissa Black_

                DECLARANT    Melissa Black

15

16

17             DATED this <u>22</u> day of February, 2013.

18

19

20           /s/ Lisa McMahon-Myhran

21           Lisa McMahon-Myhran, 00084

           ROBINSON TAIT, P.S.

22

23

24

25

26

27

28   Declaration- 2 -

    60410-0168-BK-2\

# ADJUSTABLE RATE NOTE

**(LIBOR 6 Month Index (As Published In The Wall Street Journal) - Rate Caps)**

**THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE AND MY MONTHLY PAYMENT. THIS NOTE LIMITS THE AMOUNT MY INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE I MUST PAY.**

April 18, 2005                                              IRVINE  ,          California
[Date]                                    [City]                        [State]


8230 SE Yamhill Street, Portland, OR  97216
[Property Address]


## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $ 202,400.00                    (this amount is called "principal"), plus interest, to the order of the Lender. The Lender is Aames Funding Corporation DBA Aames Home Loan

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

Interest will be charged on unpaid principal until the full amount of principal has been paid. I will pay interest at a yearly rate of                    8.990   %. The interest rate I will pay may change in accordance with Section 4 of this Note.

The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

## 3. PAYMENTS

### (A) Time and Place of Payments

I will pay principal and interest by making payments every month.

I will make my monthly payments on the  1st          day of each month beginning on  June 1st        , 2005        . I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. My monthly payments will be applied to interest before principal. If, on May 1, 2035        , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at  Aames Funding Corporation DBA Aames Home Loan, 350 South Grand Avenue, 47th Floor, Los Angeles, CA  90071        , or at a different place if required by the Note Holder.

### (B) Amount of My Initial Monthly Payments

Each of my initial monthly payments will be in the amount of U.S. $ 1,627.10                    . This amount may change.

### (C) Monthly Payment Changes

Changes in my monthly payment will reflect changes in the unpaid principal of my loan and in the interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 of this Note.

## 4. INTEREST RATE AND MONTHLY PAYMENT CHANGES

### (A) Change Dates

The interest rate I will pay may change on the  1st        day of        May              , 2007        , and on that day every 6th        month thereafter. Each date on which my interest rate could change is called a "Change Date."

**OREGON ADJUSTABLE RATE NOTE - LIBOR 6 MONTH INDEX (AS PUBLISHED IN THE WALL STREET JOURNAL) - Single Family**

**(B) The Index**

Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the average of interbank offered rates for 6 month U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in *The Wall Street Journal*. The most recent Index figure available as of the first business day of the month immediately preceding the month in which the Change Date occurs is called the "Current Index. "

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

**(C) Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding  Six and 350 Thousandths

percentage point(s) (                                                       6.350%) to the Current

Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than                         11.990 % or

less than                                       8.990 %. Thereafter, my interest rate will never be increased or decreased on any

single Change Date by more than        One

percentage point(s) (                 1.000 %) from the rate of interest I have been paying for the preceding      Six

months. My interest rate will never be greater than                                            14.990 % or less than

8.990 %.

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given me and also the telephone number of a person who will answer any question I may have regarding the notice.

## 5. BORROWER'S RIGHT TO PREPAY

I have the right to make payments of principal at any time before they are due. A payment of principal only is known as a "prepayment." When I make a prepayment, I will tell the Note Holder in writing that I am doing so.

Except as provided below, I may make a full prepayment or partial prepayments without paying any prepayment charge. The Note Holder will use all of my prepayments to reduce the amount of principal that I owe under this Note. If I make a partial prepayment, there will be no changes in the due dates of my monthly payments unless the Note Holder agrees in writing to those changes. My partial prepayment may reduce the amount of my monthly payments after the first Change Date following my partial prepayment. However, any reduction due to my partial prepayment may be offset by an interest rate increase.

However, if within the first        2   years after the execution of the Deed of Trust, I make any prepayments(s) of principal, whether voluntarily, involuntarily, or upon acceleration of the Note within any 12-month period the total amount of which exceeds twenty percent (20%) of the original principal amount of this loan, I will pay a prepayment charge in an amount equal to the payment of six (6) months' advanced interest on the amount by which the total of my prepayment(s) within that 12-month period exceeds twenty percent (20%) of the original principal amount of the loan.

## 6. LOAN CHARGES

This Note shall be governed by the laws of the State of Oregon. If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (i) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (ii) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the principal I owe under this Note or by making a direct payment to me. If a refund reduces principal, the reduction will be treated as a partial prepayment.

## 7. BORROWER'S FAILURE TO PAY AS REQUIRED

### (A) Late Charges for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of   Fifteen

calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be                    5.000   % of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

### (B) Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

### (C) Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of principal that has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is delivered or mailed to me.

### (D) No Waiver By Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

### (E) Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

## 8. GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Unless the Note Holder requires a different method, any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

## 9. OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

## 10. WAIVERS

I and any other person who has obligations under this Note waive the rights of presentment and notice of dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

**11. UNIFORM SECURED NOTE**

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses that might result if I do not keep the promises that I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** If all or any part of the Property or any interest in it is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by federal law as of the date of this Security Instrument. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by applicable law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

| | |
|---|---|
| _____ (Seal)<br>Ha  To  Ha                -Borrower | _____ (Seal)<br>-Borrower |
| _____ (Seal)<br>-Borrower | _____ (Seal)<br>-Borrower |

*[Sign Original Only]*

**Endorsement and Assignment of Note**

Re: Loan No. _0004051140_                                                    Date _04/22/05_

Borrower's Name: _Ha To Ha_

Property Address: _8230 SE Yamhill Street_

_Portland, OR 97216_

Note Date: _MRL 19,05_

Loan Amount: _$202,400.00_

Los Angeles, California

For value received, I hereby transfer, endorse and assign to _____ the within Note and
Deed of Trust securing the same, so far as the same pertains to said Note, without recourse.

Aames Funding Corporation, DBA Aames Home Loan

X _____                                   X _____
  ,Assistant Secretary                                              ,Assistant Secretary

**Thuytien Phung**

AC702803.DOC (08/98)

95
*\&$^S$
11

Until a change is requested all tax statements shall be
sent to the following address.
Aames Funding Corporation DBA
Aames Home Loan
350 South Grand Avenue
Los Angeles, CA 90071
**WHEN RECORDED MAIL TO**

Recorded in MULTNOMAH COUNTY, OREGON
               C. Swick,  Deputy Clerk
                                              **ATTDS**
C18     19
Total :      111.00

2005-074270          04/27/2005 02:37:12pm

TransUnion Settlement Solutions, Inc.
Attn: Recording Department
5300 Brandywine Parkway
Suite 100
Wilmington, DE  19803


**TAX ACCOUNT NUMBER**
R281439
───────────── [Space Above This Line For Recording Data] ─────────────

# DEED OF TRUST

**DEFINITIONS**

Words used in multiple sections of this document are defined below and other words are defined in Sections
3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided
in Section 16.

(A) "**Security Instrument**" means this document, which is dated   April 18, 2005
together with all Riders to this document.
(B) "**Borrower**" is   HA TO HA

Borrower is the trustor under this Security Instrument.
(C) "**Lender**" is  Aames Funding Corporation DBA Aames Home Loan

Lender is a   Corporation
organized and existing under the laws of   The State of California

DOC  #:317841               APPL #:0004051140
**OREGON**-Single Family-**Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**                Form 3838 1/01

⊛ -6(OR) (0104)
Page 1 of 15   UM50 0104.02   Initials: ___
   VMP MORTGAGE FORMS - (800)521-7291

19

FIDELITY NATIONAL TITLE CO.  03 - 3112713

Lender's address is  350 South Grand Avenue, 42nd Floor, Los Angeles, CA
90071

Lender is the beneficiary under this Security Instrument.

(D) "Trustee" is  Lindsay Harte Law Office

(E) "Note" means the promissory note signed by Borrower and dated   April 18, 2005
The Note states that Borrower owes Lender   Two Hundred Two Thousand Four Hundred
and No/100                                                                                  **Dollars**
(U.S. $  202,400.00          ) plus interest. Borrower has promised to pay this debt in regular Periodic
Payments and to pay the debt in full not later than   May 1, 2035

(F) "Property" means the property that is described below under the heading "Transfer of Rights in the
Property."

(G) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges
due under the Note, and all sums due under this Security Instrument, plus interest.

(H) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following
Riders are to be executed by Borrower [check box as applicable]:

| [X] Adjustable Rate Rider | [ ] Condominium Rider | [ ] Second Home Rider |
| [ ] Balloon Rider | [ ] Planned Unit Development Rider | [ ] 1-4 Family Rider |
| [ ] VA Rider | [ ] Biweekly Payment Rider | [ ] Other(s) [specify] |

(I) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations,
ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final,
non-appealable judicial opinions.

(J) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other
charges that are imposed on Borrower or the Property by a condominium association, homeowners
association or similar organization.

(K) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check,
draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument,
computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an
account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine
transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(L) "Escrow Items" means those items that are described in Section 3.

(M) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by
any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i)
damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property;
(iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or
condition of the Property.

(N) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the
Loan.

(O) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the
Note, plus (ii) any amounts under Section 3 of this Security Instrument.

(P) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its
implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time,
or any additional or successor legislation or regulation that governs the same subject matter. As used in this
Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard

DOC  #:317842                   APPL #:0004051140

to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(Q) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

### TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the County of MULTNOMAH :

[Type of Recording Jurisdiction]                    [Name of Recording Jurisdiction]

As per Exhibit A attached hereto and made a part hereof

which currently has the address of

8230 SE Yamhill Street                                                          [Street]
Portland                                               [City], Oregon 97216            [Zip Code]
("Property Address"):

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1. **Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S.

DOC #:317843                          APPL #:0004051140

Initials: ___

-6(OR) (0104)                          Page 3 of 15                          Form 3038 1/01

currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees and Assessments, if any, be escrowed by Borrower, and such dues, fees, and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower

shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. Charges; Liens. Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10

days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to

Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. Occupancy. Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. Preservation, Maintenance and Protection of the Property; Inspections. Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8. Borrower's Loan Application. Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument. If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable

DOC #:317847

APPL #:0004051140

-6(OR) (0104)                    Page 7 of 15

Initials:

Form 3038  1/01

Description: Multnomah,OR Document-Year.DocID 2005.74270 Page: 7 of 19
Order: 100361229 Comment:

attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10. Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

DOC #:317848        APPL #:0004051140
-8(OR) (0104)        Page 8 of 15        Initials:        Form 3038 1/01

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

12. Borrower Not Released; Forbearance By Lender Not a Waiver. Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender

DOC #:317849                APPL #:0004051140

-6(OR) (0104)                Page 9 of 15                    Form 3038  1/01

to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

13. Joint and Several Liability; Co-signers; Successors and Assigns Bound. Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

14. Loan Charges. Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

15. Notices. All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a

notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. Hazardous Substances. As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

DOC  #:317852                    APPL #:0004051140

-6(OR) (0104)                    Page 12 of 15          Initials:              Form 3038  1/01

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. **Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold and shall cause such notice to be recorded in each county in which any part of the Property is located. Lender or Trustee shall give notice of sale in the manner prescribed by Applicable Law to Borrower and to other persons prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

23. **Reconveyance.** Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Such person or persons shall pay any recordation costs. Lender may charge such person or persons a fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law.

24. **Substitute Trustee.** Lender may from time to time remove Trustee and appoint a successor trustee to any Trustee appointed hereunder. Without conveyance of the Property, the successor trustee shall succeed to all the title, power and duties conferred upon Trustee herein and by Applicable Law.

25. **Attorneys' Fees.** As used in this Security Instrument and in the Note, attorneys' fees shall include those awarded by an appellate court.

26. **Protective Advances.** This Security Instrument secures any advances Lender, at its discretion, may make under Section 9 of this Security Instrument to protect Lender's interest in the Property and rights under this Security Instrument.

27. **Required Evidence of Property Insurance.**

### WARNING

Unless you provide us with evidence of the insurance coverage as required by our contract or loan agreement, we may purchase insurance at your expense to protect our interest. This insurance may, but need not, also protect your interest. If the collateral becomes damaged, the coverage we purchase may not pay any claim you make or any claim made against you. You may later cancel this coverage by providing evidence that you have obtained property coverage elsewhere.

DOC #:317853                    APPL #:0004051140

-6(OR) (0104)                   Page 13 of 15                          Initials                      Form 3038  1/01

You are responsible for the cost of any insurance purchased by us. The cost of this insurance may be added to your contract or loan balance. If the cost is added to your contract or loan balance, the interest rate on the underlying contract or loan will apply to this added amount. The effective date of coverage may be the date your prior coverage lapsed or the date you failed to provide proof of coverage.

The coverage we purchase may be considerably more expensive than insurance you can obtain on your own and may not satisfy any need for property damage coverage or any mandatory liability insurance requirements imposed by Applicable Law.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____          _____ (Seal)
                                           Ha  To  Ha                -Borrower

_____          _____ (Seal)
                                                                     -Borrower

_____ (Seal)          _____ (Seal)
                    -Borrower                                        -Borrower

_____ (Seal)          _____ (Seal)
                    -Borrower                                        -Borrower

_____ (Seal)          _____ (Seal)
                    -Borrower                                        -Borrower

DOC #:317854                APPL #:0004051140

-6(OR) (0104)                    Page 14 of 15                    Form 3038  1/01

STATE OF OREGON, *Multnomah*   County ss:
   On this *2157* day of *April 2005*   , personally appeared the above named
Ha To Ha

and acknowledged the foregoing instrument to be his/her/their voluntary act and deed.

My Commission Expires: 1/5/08

Before me: *L. HARLESS*

(Official Seal)

*L. Harkless*

Notary Public for Oregon

OFFICIAL SEAL
**L. HARKLESS**
NOTARY PUBLIC-OREGON
COMMISSION NO. 375355
MY COMMISSION EXPIRES JANUARY 5, 2008

DOC #:317855

APPL #:0004051140

Page 15 of 15

Initials____

Form 3038  1/01

-6(OR) (0104)

# ADJUSTABLE RATE RIDER
### (LIBOR 6 Month Index (As Published In The Wall Street Journal) - Rate Caps)

THIS ADJUSTABLE RATE RIDER is made this    18th        day of    April        ,
2005        , and is incorporated into and shall be deemed to amend and supplement the Mortgage,
Deed of Trust or Security Deed (the "Security Instrument") of the same date given by the undersigned (the
"Borrower") to secure Borrower's Adjustable Rate Note (the "Note") to    Aames Funding
Corporation DBA Aames Home Loan

(the "Lender") of the same date and covering the Property described in the Security Instrument and
located at:

8230 SE Yamhill Street, Portland, OR  97216
[Property Address]

**THE NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN THE
INTEREST RATE AND THE MONTHLY PAYMENT. THE NOTE LIMITS THE
AMOUNT THE BORROWER'S INTEREST RATE CAN CHANGE AT ANY
ONE TIME AND THE MAXIMUM RATE THE BORROWER MUST PAY.**

**ADDITIONAL COVENANTS.** In addition to the covenants and agreements made in the Security
Instrument, Borrower and Lender further covenant and agree as follows:
**A. INTEREST RATE AND MONTHLY PAYMENT CHANGES**
The Note provides for an initial interest rate of                     8.990 %. The Note provides for
changes in the interest rate and the monthly payments, as follows:
**4. INTEREST RATE AND MONTHLY PAYMENT CHANGES**
(A) Change Dates
The interest rate I will pay may change on the    1st        day of    May            , 2007     ,
and on that day every    6th        month thereafter. Each date on which my interest rate could change
is called a "Change Date."
(B) The Index
Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the
average of interbank offered rates for 6 month U.S. dollar-denominated deposits in the London market
("LIBOR"), as published in The Wall Street Journal. The most recent Index figure available as of the first
**MULTISTATE ADJUSTABLE RATE RIDER-LIBOR 6 MONTH INDEX (AS PUBLISHED IN THE WALL STREET
JOURNAL) -Single Family**

**-AS838U** (9705)    DOC  #:505171   PPL #:0004051160
Page 1 of 3                     Initials: _____
ELECTRONIC LASER FORMS, INC. - (800)327-0645

business day of the month immediately preceding the month in which the Change Date occurs is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new Index that is based upon comparable information. The Note Holder will give me notice of this choice.

(C) Calculation of Changes

Before each Change Date, the Note Holder will calculate my new interest rate by adding Six and 350 Thousandths percentage point(s) ( 6.350 %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

(D) Limits on Interest Rate Changes

The interest rate I am required to pay at the first Change Date will not be greater than 11.990 % or less than 8.990 %. Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than One

percentage point(s) ( 1.000 %) from the rate of interest I have been paying for the preceding 6 months. My interest rate will never be greater than 14.990 % or less than 8.990 %.

(E) Effective Date of Changes

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

(F) Notice of Changes

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given me and also the telephone number of a person who will answer any question I may have regarding the notice.

B. TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER Uniform Covenant 17 of the Security Instrument is amended to read as follows:

Transfer of the Property or a Beneficial Interest in Borrower. If all or any part of the Property or any interest in it is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by federal law as of the date of this Security Instrument. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender

**-AS838U** (9705)                                    Page 2 of 3

DOC #:505172   APPL #:0004051140

information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by applicable law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider.

_____ (Seal)          _____ (Seal)
Ha To Ha                  -Borrower                                   -Borrower

_____ (Seal)          _____ (Seal)
                          -Borrower                                   -Borrower

_____ (Seal)          _____ (Seal)
                          -Borrower                                   -Borrower

_____ (Seal)          _____ (Seal)
                          -Borrower                                   -Borrower

-AS838U (9705)                                    Page 3 of 3

DOC  #:505173  APPL #:0004051140

53

When recorded, mail to:

**RESIDENTIAL CREDIT SOLUTIONS**
Attn: Foreclosure Department
4282 N FREEWAY
FORT WORTH, TEXAS 76137

**Multnomah County Official Records**
**C Swick, Deputy Clerk**                **2010-077497**

$41.00
00685160201000774970020025
06/23/2010 01:27:43 PM

1R-MTG ASGT          Cnt=1 Stn=43 ATRGW
$10.00 $11.00 $15.00 $5.00

---

Trustee's Sale No: 09-FAA-96724

# *FAA967240112000000*

### ASSIGNMENT OF DEED OF TRUST

FOR VALUE RECEIVED, the undersigned, AAMES FUNDING CORPORATION DBA AAMES HOME LOAN, by these presents, grants, bargains, sells, assigns, transfers and sets over unto DEUTSCHE BANK NATIONAL TRUST COMPANY in its capacity as indenture trustee for the Noteholders of AAMES MORTGAGE INVESTMENT TRUST 2005-2, a Delaware statutory trust., 4282 N Freeway, Fort Worth, TX 76137, all beneficial interest under that certain Deed of Trust dated 4/18/2005, and executed by HA TO HA, as Grantor, to LINDSAY HARTE LAW OFFICE, as Trustee, and recorded on 4/27/2005, under Auditor s File No. 2005-074270, of MULTNOMAH County, State of OREGON, and covering property more fully described on said Deed of Trust referred to herein.

Together with the Note or Notes therein described or referred to, the money due and to become due therein with interest, and all rights accrued or to accrue under said Deed of Trust.

1                              Assn



Trustee's Sale No: 09-FAA-96724

Dated: 6/18/10

AAMES FUNDING CORPORATION DBA AAMES
HOME LOAN

BY: _____

Name: Jeffrey W. Gideon

Title: Vice President

STATE OF __Texas__ )
COUNTY OF __Tarrant__ ) ss.
) 

On 6/18/10 , before me, Amy McQueen, Notary Public
personally appeared __Jeffrey W. Gideon__, who proved to me on the basis of
satisfactory evidence to be the person(s) whose name is/are subscribed to the within instrument and
acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies) and
that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the
person(s) acted executed the instrument.

WITNESS my hand and official seal.

_____
NOTARY PUBLIC in and for the State of
__Texas__, residing at __Tarrant__
My commission expires: 8/28/12

2                                          Assn

The Honorable Randall L. Dunn

Lisa McMahon-Myhran
Robinson Tait, P.S.
710 Second Avenue, Suite 710
Seattle WA  98104
(206) 676-9640

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF OREGON
AT PORTLAND

In Re:                                          BANKRUPTCY NO. 12-38965-rld13

HA TO HA                                     CHAPTER NO.  13

              Debtor.                         PROOF OF SERVICE

          Andrew Roche, under penalty of perjury under the laws of the United States,
declares as follows:

          1.      That I am a citizen of the United States, over the age of 21 years, and
competent to be a witness herein.

          2.      That on February 26, 2013, I transmitted electronically and/or by depositing
in the United States mail, postage prepaid (as indicated herein), copies of the:
Declaration in Support of Objection to Confirmation of Plan

addressed as follows:

Ha To Ha
8230 SE Yamhill St
Portland, OR 97216

and to:

          WAYNE GODARE                    c0urtmail@portland13.com

PROOF OF SERVICE - 1
60300-0213-BK-2\OR Proof of Service

Law Offices
ROBINSON TAIT, P.S.
710 Second Avenue, Suite 710
Seattle WA  98104
(206) 676-9640

| | |
|---|---|
| 1 | U.S. Trustee |

U.S. Trustee                          USTPRegion18.PL.ECF@usdoj.gov

Dated February 26, 2013.

/s/ *Andrew Roche*
Andrew Roche

**PROOF OF SERVICE - 2**
60300-0213-BK-2\OR Proof of Service

*Law Offices*
ROBINSON TAIT, P.S.
710 Second Avenue, Suite 710
Seattle WA 98104
(206) 676-9640

# Exhibit 5

Aames Mortgage Investment Trust
Mortgage-Backed Notes
Distribution Date:    25-Jan-2013

Case 13-32107-elp7    Doc 26    Filed 06/04/13

Aames Mortgage Investment Trust
Mortgage-Backed Notes
Series 2005-2

Contact:  Customer Service - CTSLink
Wells Fargo Bank, N.A.
Securities Administration Services
8480 Stagecoach Circle
Frederick, MD 21701-4747
www.ctslink.com
Telephone:    1-866-846-4526
Fax:            240-586-8675

23-Jan-2013    9:38 53AM

### Certificateholder Distribution Summary

| Class | CUSIP | Record Date | Certificate Pass-Through Rate | Beginning Certificate Balance | Interest Distribution | Principal Distribution | Current Realized Loss | Ending Certificate Balance | Total Distribution | Cumulative Realized Losses |
|---|---|---|---|---|---|---|---|---|---|---|
| 1A1 | 126673K43 | 01/24/2013 | 0.36970 % | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 1A2 | 126673K50 | 01/24/2013 | 0.64970 % | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 1A3 | 126673K68 | 01/24/2013 | 0.92970 % | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 2A1 | 126673K76 | 01/24/2013 | 0.66970 % | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| M1 | 126673K84 | 01/24/2013 | 0.88470 % | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| M2 | 126673K92 | 01/24/2013 | 0.91470 % | 3,037,961.00 | 2,315.69 | 1,078,572.98 | 0.00 | 1,959,388.02 | 1,080,888.67 | 0.00 |
| M3 | 126673L26 | 01/24/2013 | 0.95970 % | 24,325,000.00 | 19,453.92 | 0.00 | 0.00 | 24,325,000.00 | 19,453.92 | 0.00 |
| M4 | 126673L34 | 01/24/2013 | 1.15470 % | 22,008,000.00 | 21,177.20 | 0.00 | 0.00 | 22,008,000.00 | 21,177.20 | 0.00 |
| M5 | 126673L42 | 01/24/2013 | 1.19970 % | 19,113,000.00 | 19,108.22 | 0.00 | 0.00 | 19,113,000.00 | 19,108.22 | 0.00 |
| M6 | 126673L59 | 01/24/2013 | 1.28970 % | 16,796,000.00 | 18,051.50 | 0.00 | 0.00 | 16,796,000.00 | 18,051.50 | 0.00 |
| M7 | 126673L67 | 01/24/2013 | 2.00970 % | 18,533,000.00 | 30,379.08 | 0.00 | 0.00 | 18,533,000.00 | 30,379.08 | 0.00 |
| M8 | 126673L75 | 01/24/2013 | 0.00000 % | 14,479,000.00 | 0.00 | 0.00 | 0.00 | 14,479,000.00 | 0.00 | 0.00 |
| M9 | 126673L83 | 01/24/2013 | 0.00000 % | 13,321,000.00 | 0.00 | 0.00 | 0.00 | 13,321,000.00 | 0.00 | 0.00 |
| B1 | 126673L91 | 01/24/2013 | 0.00000 % | 12,700,000.00 | 0.00 | 0.00 | 0.00 | 12,700,000.00 | 0.00 | 0.00 |
| B2 | 126673M25 | 01/24/2013 | 0.00000 % | 5,833,000.00 | 0.00 | 0.00 | 0.00 | 5,833,000.00 | 0.00 | 0.00 |
| B3 | 126673M33 | 01/24/2013 | 0.00000 % | 6,950,000.00 | 0.00 | 0.00 | 0.00 | 6,950,000.00 | 0.00 | 0.00 |
| B4 | 126673M90 | 01/24/2013 | 0.00000 % | 5,609,963.41 | 0.00 | 0.00 | 0.00 | 5,609,963.41 | 0.00 | 0.00 |
| OC | 126673OT0 | 12/31/2012 | 0.00000 % | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Totals | | | | 162,705,924.41 | 110,485.61 | 1,078,572.98 | 0.00 | 161,627,351.43 | 1,189,058.59 | 0.00 |

As Master Servicer, Wells Fargo Bank, N.A. has independently calculated collateral information based on loan level data received from external parties, which may include the Servicers.
Issuer and other parties to the transaction  Wells Fargo Bank, N.A. expressly disclaims any responsibility for the accuracy or completeness of information furnished to it by those third parties.

All Record Dates are based upon the governing documents and logic set forth as of closing

Case 13-32107-elp7    Doc 26    Filed 06/04/13

**Aames Mortgage Investment Trust**
**Mortgage-Backed Notes**
**Series 2005-2**

Contact:  Customer Service - CTSLink
Wells Fargo Bank, N.A.
Securities Administration Services
8480 Stagecoach Circle
Frederick, MD 21701-4747
www.ctslink.com
Telephone:     1-866-846-4526
Fax:           240-586-8675

**Principal Distribution Statement**

| Class | Original Face Amount | Beginning Certificate Balance | Scheduled Principal Distribution | Unscheduled Principal Distribution | Accretion | Realized Loss | Total Principal Reduction | Ending Certificate Balance | Ending Certificate Percentage | Total Principal Distribution |
|---|---|---|---|---|---|---|---|---|---|---|
| 1A1 | 143,042,000.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00000000 | 0.00 |
| 1A2 | 289,696,000.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00000000 | 0.00 |
| 1A3 | 17,300,000.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00000000 | 0.00 |
| 2A1 | 449,414,000.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00000000 | 0.00 |
| M1 | 40,542,000.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00000000 | 0.00 |
| M2 | 41,121,000.00 | 3,037,961.00 | 0.00 | 1,078,572.98 | 0.00 | 0.00 | 1,078,572.98 | 1,959,388.02 | 0.04764933 | 1,078,572.98 |
| M3 | 24,325,000.00 | 24,325,000.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 24,325,000.00 | 1.00000000 | 0.00 |
| M4 | 22,008,000.00 | 22,008,000.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 22,008,000.00 | 1.00000000 | 0.00 |
| M5 | 19,113,000.00 | 19,113,000.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 19,113,000.00 | 1.00000000 | 0.00 |
| M6 | 16,796,000.00 | 16,796,000.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 16,796,000.00 | 1.00000000 | 0.00 |
| M7 | 18,533,000.00 | 18,533,000.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 18,533,000.00 | 1.00000000 | 0.00 |
| M8 | 14,479,000.00 | 14,479,000.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 14,479,000.00 | 1.00000000 | 0.00 |
| M9 | 13,321,000.00 | 13,321,000.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 13,321,000.00 | 1.00000000 | 0.00 |
| B1 | 12,700,000.00 | 12,700,000.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 12,700,000.00 | 1.00000000 | 0.00 |
| B2 | 5,833,000.00 | 5,833,000.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 5,833,000.00 | 1.00000000 | 0.00 |
| B3 | 6,950,000.00 | 6,950,000.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 6,950,000.00 | 1.00000000 | 0.00 |
| B4 | 9,264,000.00 | 5,609,963.41 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 5,609,963.41 | 0.60556600 | 0.00 |
| OC | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00000000 | 0.00 |
| Totals | 1,144,437,000.00 | 162,705,924.41 | 0.00 | 1,078,572.98 | 0.00 | 0.00 | 1,078,572.98 | 161,627,351.43 | 0.14122870 | 1,078,572.98 |

NOTE: Accretion amount also includes Net Negative Amortization, if applicable

Aames Mortgage Investment Trust
Mortgage-Backed Notes
Distribution Date:    25-Jan-2013

Case 13-32107-elp7    Doc 26    Filed 06/04/13
Aames Mortgage Investment Trust
Mortgage-Backed Notes
Series 2005-2

Contact:  Customer Service - CTSLink
Wells Fargo Bank, N.A.
Securities Administration Services
8480 Stagecoach Circle
Frederick, MD 21701-4747
www.ctslink.com
Telephone:    1-866-846-4526
Fax:          240-586-8675

23-Jan-2013    9:38:53AM

**Principal Distribution Factors Statement**

| Class | Original Face Amount | Beginning Certificate Balance | Scheduled Principal Distribution | Unscheduled Principal Distribution | Accretion | Realized Loss | Total Principal Reduction | Ending Certificate Balance | Ending Certificate Percentage | Total Principal Distribution |
|---|---|---|---|---|---|---|---|---|---|---|
| 1A1 | 143,042,000.00 | 0.00000000 | 0.00000000 | 0.00000000 | 0.00000000 | 0.00000000 | 0.00000000 | 0.00000000 | 0.00000000 | 0.00000000 |
| 1A2 | 289,696,000.00 | 0.00000000 | 0.00000000 | 0.00000000 | 0.00000000 | 0.00000000 | 0.00000000 | 0.00000000 | 0.00000000 | 0.00000000 |
| 1A3 | 17,300,000.00 | 0.00000000 | 0.00000000 | 0.00000000 | 0.00000000 | 0.00000000 | 0.00000000 | 0.00000000 | 0.00000000 | 0.00000000 |
| 2A1 | 449,414,000.00 | 0.00000000 | 0.00000000 | 0.00000000 | 0.00000000 | 0.00000000 | 0.00000000 | 0.00000000 | 0.00000000 | 0.00000000 |
| M1 | 40,542,000.00 | 0.00000000 | 0.00000000 | 0.00000000 | 0.00000000 | 0.00000000 | 0.00000000 | 0.00000000 | 0.00000000 | 0.00000000 |
| M2 | 41,121,000.00 | 73.87857786 | 0.00000000 | 26.22924978 | 0.00000000 | 0.00000000 | 26.22924978 | 47.64932808 | 0.04764933 | 26.22924978 |
| M3 | 24,325,000.00 | 1000.00000000 | 0.00000000 | 0.00000000 | 0.00000000 | 0.00000000 | 0.00000000 | 1000.00000000 | 1.00000000 | 0.00000000 |
| M4 | 22,008,000.00 | 1000.00000000 | 0.00000000 | 0.00000000 | 0.00000000 | 0.00000000 | 0.00000000 | 1000.00000000 | 1.00000000 | 0.00000000 |
| M5 | 19,113,000.00 | 1000.00000000 | 0.00000000 | 0.00000000 | 0.00000000 | 0.00000000 | 0.00000000 | 1000.00000000 | 1.00000000 | 0.00000000 |
| M6 | 16,796,000.00 | 1000.00000000 | 0.00000000 | 0.00000000 | 0.00000000 | 0.00000000 | 0.00000000 | 1000.00000000 | 1.00000000 | 0.00000000 |
| M7 | 18,533,000.00 | 1000.00000000 | 0.00000000 | 0.00000000 | 0.00000000 | 0.00000000 | 0.00000000 | 1000.00000000 | 1.00000000 | 0.00000000 |
| M8 | 14,479,000.00 | 1000.00000000 | 0.00000000 | 0.00000000 | 0.00000000 | 0.00000000 | 0.00000000 | 1000.00000000 | 1.00000000 | 0.00000000 |
| M9 | 13,321,000.00 | 1000.00000000 | 0.00000000 | 0.00000000 | 0.00000000 | 0.00000000 | 0.00000000 | 1000.00000000 | 1.00000000 | 0.00000000 |
| B1 | 12,700,000.00 | 1000.00000000 | 0.00000000 | 0.00000000 | 0.00000000 | 0.00000000 | 0.00000000 | 1000.00000000 | 1.00000000 | 0.00000000 |
| B2 | 5,833,000.00 | 1000.00000000 | 0.00000000 | 0.00000000 | 0.00000000 | 0.00000000 | 0.00000000 | 1000.00000000 | 1.00000000 | 0.00000000 |
| B3 | 6,950,000.00 | 1000.00000000 | 0.00000000 | 0.00000000 | 0.00000000 | 0.00000000 | 0.00000000 | 1000.00000000 | 1.00000000 | 0.00000000 |
| B4 | 9,264,000.00 | 605.56599849 | 0.00000000 | 0.00000000 | 0.00000000 | 0.00000000 | 0.00000000 | 605.56599849 | 0.60556600 | 0.00000000 |
| OC | 0.00 | 0.00000000 | 0.00000000 | 0.00000000 | 0.00000000 | 0.00000000 | 0.00000000 | 0.00000000 | 0.00000000 | 0.00000000 |

NOTE: Accretion amount also includes Net Negative Amortization, if applicable

NOTE: All classes per $1,000 denominations

Aames Mortgage Investment Trust
Mortgage-Backed Notes
Distribution Date: 25-Jan-2013

25-Jan-2013    9:18:53 AM

Case 13-32107-elp7   Doc 26   Filed 06/04/13

**Aames Mortgage Investment Trust**
**Mortgage-Backed Notes**
**Series 2005-2**

Contact: Customer Service - CTSLink
Wells Fargo Bank, N.A.
Securities Administration Services
8480 Stagecoach Circle
Frederick, MD 21701-4747
www.ctslink.com
Telephone:    1-866-846-4526
Fax:    240-586-8675

## Interest Distribution Statement

| Class | Accrual Dates | Accrual Days | Current Certificate Rate | Beginning Certificate/ Notional Balance | Current Accrued Interest | Payment of Unpaid Interest Shortfall(1) | Current Interest Shortfall(1) | Non-Supported Interest Shortfall | Total Interest Distribution | Remaining Unpaid Interest Shortfall(1) | Ending Certificate/ Notional Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1A1 | N/A | N/A | 0.36970 % | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 1A2 | N/A | N/A | 0.64970 % | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 1A3 | N/A | N/A | 0.92970 % | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 2A1 | N/A | N/A | 0.66970 % | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| M1 | N/A | N/A | 0.88470 % | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| M2 | 12/26/12 - 01/24/13 | 30 | 0.91470 % | 3,037,961.00 | 2,315.69 | 0.00 | 0.00 | 0.00 | 2,315.69 | 0.00 | 1,959,388.02 |
| M3 | 12/26/12 - 01/24/13 | 30 | 0.95970 % | 24,325,000.00 | 19,453.92 | 0.00 | 0.00 | 0.00 | 19,453.92 | 0.00 | 24,325,000.00 |
| M4 | 12/26/12 - 01/24/13 | 30 | 1.15470 % | 22,008,000.00 | 21,177.20 | 0.00 | 0.00 | 0.00 | 21,177.20 | 0.00 | 22,008,000.00 |
| M5 | 12/26/12 - 01/24/13 | 30 | 1.19970 % | 19,113,000.00 | 19,108.22 | 0.00 | 0.00 | 0.00 | 19,108.22 | 0.00 | 19,113,000.00 |
| M6 | 12/26/12 - 01/24/13 | 30 | 1.28970 % | 16,796,000.00 | 18,051.50 | 0.00 | 0.00 | 0.00 | 18,051.50 | 0.00 | 16,796,000.00 |
| M7 | 12/26/12 - 01/24/13 | 30 | 2.00970 % | 18,533,000.00 | 31,038.14 | 0.00 | 659.06 | 0.00 | 30,379.08 | 659.06 | 18,533,000.00 |
| M8 | N/A | N/A | 0.00000 % | 14,479,000.00 | 26,963.52 | 0.00 | 26,963.52 | 0.00 | 0.00 | 370,360.87 | 14,479,000.00 |
| M9 | N/A | N/A | 0.00000 % | 13,321,000.00 | 33,132.66 | 0.00 | 33,132.66 | 0.00 | 0.00 | 1,117,264.66 | 13,321,000.00 |
| B1 | N/A | N/A | 0.00000 % | 12,700,000.00 | 49,844.32 | 0.00 | 49,844.32 | 0.00 | 0.00 | 2,295,275.68 | 12,700,000.00 |
| B2 | N/A | N/A | 0.00000 % | 5,833,000.00 | 22,893.07 | 0.00 | 22,893.07 | 0.00 | 0.00 | 1,131,740.69 | 5,833,000.00 |
| B3 | N/A | N/A | 0.00000 % | 6,950,000.00 | 27,277.01 | 0.00 | 27,277.01 | 0.00 | 0.00 | 1,392,517.07 | 6,950,000.00 |
| B4 | N/A | N/A | 0.00000 % | 5,609,963.41 | 22,017.70 | 0.00 | 22,017.70 | 0.00 | 0.00 | 1,167,092.31 | 5,609,963.41 |
| OC | N/A | N/A | 0.00000 % | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Totals | | | | | 293,272.95 | 0.00 | 182,787.34 | 0.00 | 110,485.61 | 7,474,910.34 | |

(1) Amount also includes Coupon Cap or Basis Risk Shortfalls, if applicable.

```
<DOCUMENT>
<TYPE>EX-99.2
<SEQUENCE>6
<FILENAME>efc5-1369_5703143ex992.txt
<TEXT>
```
                              Exhibit 99.2

`<PAGE>`

                                                      EXECUTION COPY

================================================================================

                        AAMES INVESTMENT CORPORATION,

                               as SELLER

                                  and

                              CWABS, INC.,

                             as PURCHASER

             MORTGAGE LOAN PURCHASE AND ASSIGNMENT AGREEMENT

                          Dated as of May 1, 2005

                    Aames Mortgage Investment Trust 2005-2
                    Mortgage Backed Notes, Series 2005-2

================================================================================

`<PAGE>`

                             TABLE OF CONTENTS

             MORTGAGE LOAN PURCHASE AND ASSIGNMENT AGREEMENT

                                                                   Page

RECITALS ................................................................1


AGREEMENT................................................................2

1.   Purchase and Sale of Mortgage Loans...............................2
2.   Representations and Warranties....................................4
3.   Survival of Representations.......................................8
4.   Repurchase, Purchase or Substitution of Mortgage Loans............8
5.   Covenants.........................................................8
6.   Successors and Assigns, Additional Information....................9
7.   Indemnification...................................................9
8.   Notices..........................................................10
9.   Representations and Indemnities to Survive.......................10
10.  Miscellaneous....................................................10
11.  Severability of Provisions.......................................10
12.  Binding Nature of Agreement; Assignment..........................11
13.  Entire Agreement.................................................11
14.  Benefits of Agreement............................................11

SCHEDULE I - MORTGAGE LOAN SCHEDULE....................................I-1
SCHEDULE II -MORTGAGE LOAN REPRESENTATIONS AND WARRANTIES.............II-1

```
<DOCUMENT>
<TYPE>EX-4.3
<SEQUENCE>4
<FILENAME>efc5-1369_emailexh43.txt
<TEXT>
```

Exhibit 4.3
-----------

<PAGE>

EXECUTION COPY

AMENDED AND RESTATED TRUST AGREEMENT

among

CWABS, INC.,
as Depositor,

WILMINGTON TRUST COMPANY,
as Owner Trustee

and

WELLS FARGO BANK, N.A.,
as Trust Administrator

Dated May 31, 2005

 Aames Mortgage Investment Trust 2005-2
Mortgage Backed Notes

<PAGE>

```
<TABLE>
<CAPTION>
```

TABLE OF CONTENTS

Pa
--

ARTICLE I
DEFINITIONS

```
<S>                    <C>                                                                          <C>
Section 1.01.          Definitions...........................................................................1
Section 1.02.          Other Definitional Provisions.........................................................5
```

ARTICLE II
ORGANIZATION

```
Section 2.01.          Name..................................................................................5
Section 2.02.          Office................................................................................6
Section 2.03.          Purpose and Powers....................................................................6
Section 2.04.          Appointment of the Owner Trustee......................................................6
```

<PAGE>

## ARTICLE IX
### SUCCESSOR OWNER TRUSTEES AND ADDITIONAL OWNER TRUSTEES

Section 9.01.    Eligibility Requirements for Owner Trustee...................................................26
Section 9.02.    Resignation or Removal of Owner Trustee.....................................................27
Section 9.03.    Successor Owner Trustee.....................................................................27
Section 9.04.    Merger or Consolidation of Owner Trustee....................................................28
Section 9.05.    Appointment of Co-Trustee or Separate Trustee...............................................28

## ARTICLE X
### MISCELLANEOUS

Section 10.01.    Supplements and Amendments.................................................................29
Section 10.02.    No Legal Title to Trust Estate in Certificateholders.......................................31
Section 10.03.    Pledge of Collateral by Owner Trustee is Binding..........................................31
Section 10.04.    Limitations on Rights of Others...........................................................31
Section 10.05.    Notices...................................................................................31
Section 10.06.    Severability..............................................................................31
Section 10.07.    Separate Counterparts.....................................................................31
Section 10.08.    Successors and Assigns....................................................................32
Section 10.09.    Headings..................................................................................32
Section 10.10.    Governing Law.............................................................................32
Section 10.11.    No Petition...............................................................................32
Section 10.12.    No Recourse...............................................................................32
Section 10.13.    Customer Identification...................................................................33

## ARTICLE XI
### OFFICERS

Section 11.01.    Appointment of Officers...................................................................33
Section 11.02.    Officers to Provide Information to the Owner Trustee.......................................33


Exhibit A        Forms of Certificates
Exhibit B        [Reserved]
Exhibit C        Form of Certificate of Trust
Exhibit D-1      Form of Rule 144A Investment Letter
Exhibit D-2      Form of Non-Rule 144A Investment Letter
Exhibit E        Form of Certificate of Beneficial Owner
Exhibit F        Form of Representation and Warranty Regarding Transferee's Status as a REIT, Qualified REIT
                 Subsidiary or Disregarded Entity

</TABLE>

iii

<PAGE>

This TRUST AGREEMENT, dated May 31, 2005, is by and among CWABS, INC., a Delaware corporation (the "Depositor"), WILMINGTON TRUST COMPANY, a Delaware banking corporation, as Owner Trustee (the "Owner Trustee"), and WELLS FARGO BANK, N.A., a national banking association, as Trust Administrator (the "Trust Administrator").

WHEREAS, pursuant to the Transfer and Servicing Agreement, Depositor intends to sell, transfer and assign to a Delaware statutory trust created hereunder certain Mortgage Loans and related assets (collectively, the "Collateral"), which statutory trust would then pledge such Collateral under an indenture in order to secure the issuance of its Mortgage Backed Notes, Series 2005-2, the net proceeds of which would be applied toward the purchase of the Collateral; 

WHEREAS, the Depositor and the Owner Trustee entered into a Trust Agreement dated May 26, 2005 (the "Original Trust Agreement"), and filed with the Secretary of State of the State of Delaware a Certificate of Trust on May 26, 2005, creating Aames Mortgage Investment Trust 2005-2 (the "Trust"); and

WHEREAS, the Depositor, the Owner Trustee and the Trust Administrator desire to enter into this Amended and Restated Agreement in order to amend and restate in its entirety the Original Trust Agreement and to provide for the operation of the Trust upon the terms and conditions more particularly set forth herein.

NOW THEREFORE, in consideration of the premises and mutual agreements herein contained, the parties hereto hereby agree as follows:

## ARTICLE I

# Exhibit 6



## Melissa Black

Director, <u>Foreclosure</u> & Bankruptcy at Residential Credit Solutions. Inc
Plano, Texas (Dallas/Fort Worth Area)   Financial Services

### Join LinkedIn and access Melissa Black's full profile.

As a LinkedIn member, you'll join 200 million other professionals who are sharing connections,
ideas, and opportunities. And it's free! You'll also be able to:

- See who you and **Melissa Black** know in common                          View full profile
- Get introduced to **Melissa Black**
- Contact **Melissa Black** directly

### Melissa Black's Overview

| | |
|---|---|
| Current | **Director, Foreclosure & <u>Bankruptcy</u> at Residential Credit Solutions, Inc** |
| Past | Assistant Vice President-Customer Relations at Lender Processing Services, Inc. (LPS) |
| | Assistant Vice President-Onsite Operations at Lender Processing Services, Inc. (LPS) |
| | Special Assets Manager-Litigation at Lender Processing Services, Inc. (LPS) |
| Education | Florida Coastal School of Law |
| | University of West Florida |
| Connections | **70 connections** |

### Melissa Black's Experience

**Director, Foreclosure & Bankruptcy**
**Residential Credit Solutions, Inc**
Privately Held; 201-500 employees; Financial Services industry
October 2012 – Present (8 months)   Fort Worth, Texas

**Assistant Vice President-Customer Relations**
**Lender Processing Services, Inc. (LPS)**
Public Company; 5001-10,000 employees; LPS; Financial Services industry
September 2011 – June 2012 (10 months)

Special Project Manager for implementation of client-specific outsource servicing model.
Develop and implement project plans for multiple software and technology solutions based on client needs.
Track project resolution and performance and work collaboratively with client, operational departments, process re-engineering, and developers to
identify opportunities for added value or additional Select Services.

**Assistant Vice President-Onsite Operations**
**Lender Processing Services, Inc. (LPS)**
Public Company; 5001-10,000 employees; LPS; Financial Services industry
November 2008 – September 2011 (2 years 11 months)

Manage performance and compliance of nationwide onsite staff of 100+ associates.
Collaborate with clients to review onsite processes for Foreclosure Referral, Document Execution, and Document Retrieval. Identify opportunities for
increased productivity, quality, or cost-efficiency through use of automation and technology solutions.
Provide Performance Reporting to clients and senior management to demonstrate Onsite compliance with established parameters.
Manage and budget staffing based on revenue and productivity; complete needs analysis for future staffing using dashboard report and projected client
volume.
Develop and document procedures for onsite staff to comply with all corporate, client, federal and state-mandated regulations.
Maintain awareness of federal and state legislative changes and anticipate impact on client process flow, providing best practice recommendations and
building processes in the software to efficiently manage workflow.

**Special Assets Manager-Litigation**
**Lender Processing Services, Inc. (LPS)**
Public Company; 5001-10,000 employees; LPS; Financial Services industry
March 2005 – November 2008 (3 years 9 months)   Jacksonville, Florida Area

Manage portfolio of 3500+ contested foreclosure files (total loan asset value in excess of $770,000,000 from 22 different banks/lenders).
Managed hiring, training, and compliance of sixteen employees including performance audit/quality control and administration of performance-based
<u>bonus</u> plan.
Act as liaison between banks/lenders and network attorneys to facilitate resolution of contested matters to minimize delay in timelines.

### Melissa Black's Skills & Expertise

| | | | | | | |
|---|---|---|---|---|---|---|
| Mortgage Servicing | Default | Loss Mitigation | Loan Servicing | Mortgage Banking | Risk Management | Loans |
| Customer Service | Process Improvement | | | | | |

### Melissa Black's Education

**Florida Coastal School of Law**
Doctor of Law (J.D.)
1999 – 2002

**University of West Florida**
Bachelor's degree, Marketing
1991 – 1993

## Melissa Black's Additional Information

Groups and
Associations:      Leaders In Collections & Default Servicing in Dallas/FortWorth area

### Contact Melissa for:

- career opportunities
- new ventures
- expertise requests
- reference requests

- consulting offers
- job inquiries
- business deals
- getting back in touch

## View Melissa Black's full profile to...

- See who you and **Melissa Black** know in common
- Get introduced to **Melissa Black**
- Contact **Melissa Black** directly

    **View Full Profile**

Not the Melissa Black you were looking for? View more »

LinkedIn member directory - Browse members by country a b c d e f g h i j k l m n o p q r s t u v w x y z more

LinkedIn Corporation © 2011

# Exhibit 7

UNITED STATES BANKRUPTCY COURT

DISTRICT OF OREGON

In re:                          )
                                ) Case No. 12-38965-rld13
HA TO HA,                       )
                                ) PORTLAND, OR
        Debtor.                 ) January 31, 2013
                                ) 9:23 a.m.
                                )
                                ) Chapter 13 Confirmation
                                ) Hearing
_____  )

# ORIGINAL

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE RANDALL L. DUNN
United States Bankruptcy Judge


APPEARANCES OF COUNSEL:

For Debtor                Mr. Ha To Ha and
(Pro Se)                  MS. Jessica Sam
                          8230 Southeast Yamhill Street
                          Portland, Oregon   97216

Trustee                   Mr. Wayne Godare
                          CHAPTER 13 TRUSTEE
                          1300 Southwest Fifth Avenue
                          Suite 1700
                          Portland, Oregon   97201

For Creditor              Mr. Randall E. Poff
Deutsche Bank             ATTORNEY AT LAW
National Trust            1618 Southwest First Avenue
Company                   Suite 315
                          Portland, Oregon   97201


Capri  Iverson

Certified Realtime Reporter

1329 S.W. 3rd Avenue  Portland, OR  97205
503-727-8067  503-992-0839

```
 1                    P R O C E E D I N G S
 2
 3               JUDGE DUNN:  Ha To Ha.
 4               MR. SPEAKER:  Your Honor, outstanding
 5  objection from the trustee and one from Deutsche
 6  Bank.
 7               JUDGE DUNN:  Mr. Poff, who are you
 8  representing?
 9               MR. POFF:  Good morning, Your Honor.
10  I'm Randall Poff filling in today for Lisa
11  McMahon-Myhran for Deutsche Bank.
12               JUDGE DUNN:  All right.  There are lots
13  of problems.  Now, I talked with Ms. Ha yesterday
14  about some of them in -- at the miscellaneous
15  hearing because I wanted to give her a heads-up,
16  frankly, as to the difficulties I saw.
17               Now, I think -- two things.  Ms. Ha,
18  you're going to have to have counsel.  You're not
19  going to be able to get through this process on
20  your own.  You're just not.  So that's reality.
21               Chapter 13 -- congress, when they
22  modified the Bankruptcy Code in 2005 purportedly
23  were encouraging people to go into Chapter 13.  But
24  they made it so complicated that it's virtually
25  impossible.
```

```
 1              I'm not saying it's totally impossible
 2  because a very few -- the few, the brave, and the
 3  proud -- have managed to get through it.  But I can
 4  count on the fingers of one hand since 2005 the
 5  debtors who have handled their cases pro se in 13
 6  and have gotten through them.  And those cases were
 7  much less complex than yours.
 8              So -- but what I think -- you're
 9  fighting with the -- the alleged mortgage holder.
10  And in your schedules you're saying there's no
11  mortgage.  Now, I told you the problem with that
12  yesterday.  Because, if I ultimately rule in your
13  favor on the objection and they're not secured,
14  your problem is that you have a $200,000 house
15  that's unencumbered which would mean during the
16  life of your plan you would have to pay $150,000
17  minimum, including both you and your husband
18  claimed a homestead exemption to your creditors.
19              In other words, you're going to have to
20  sell the house if it ends up that way because
21  you're not -- $35 a month is not going to cut it.
22  But we don't have to get to that today because what
23  I think I'm going to do is set the Deutsche Bank
24  objection for evidentiary hearing, and we'll see
25  where we come out on that first.
```

1         And here are the issues. So what I'm
2   going to need evidence on at the hearing is, number
3   one, was the security interest in the house
4   properly attached and perfectioned [verbatim] --
5   perfected under Oregon real estate law? And,
6   number two, assuming that that is the case, does
7   Deutsche Bank have the authority to enforce the
8   debt?

9         Now, if they prove those things, then
10  your plan is blown out of the water. It doesn't
11  work because, if they, in fact, do have a secured
12  claim for the mortgage, then you have to provide
13  under the code for the monthly mortgage payments to
14  them, plus you have to pay the mortgage arrears
15  which are in excess of $56,000 during the life of
16  your plan. And your plan's totally not feasible to
17  do that.

18        So if they establish their standing,
19  your plan is blown out. And I don't see, based on
20  your schedules, how you can possibly perform a plan
21  in 13.

22        Now, what you may want to do is convert
23  the case to Chapter 7, get a discharge in Chapter
24  7, and fight another day about the mortgage in
25  state court because that's where you'll be -- where

```
 1   you'll end up.
 2               But, if -- if you win on their
 3   objection, we don't do any confetti parades because
 4   your plan is still patently not confirmable the way
 5   it's written because all that lovely value you
 6   think you're retaining in the house through Chapter
 7   13 you're going to have to pay to your unsecured
 8   creditors except for the exempt amount.
 9               So you've got -- you need a lawyer with
10   some experience in Chapter 13 to advise you.  I
11   don't see how you're going to survive this process
12   in Chapter 13 without an attorney.
13               So, Mr. Poff, how long is it going to
14   take your client to come up with the required
15   evidence for such a hearing?
16               MR. POFF:  I really don't know that --
17   the answer to that question, Your Honor.  Regular
18   course evidentiary hearing, you know, they'll be
19   ready.  I mean, that's all I can --
20               JUDGE DUNN:  Well, I'm not going to set
21   it in two weeks because I probably would be most
22   disappointed.  But the -- I think I have a calendar
23   on the 28th of February.
24               MS. SPEAKER:  Yes, you do.
25               JUDGE DUNN:  So I would set it for the
```

1   28th of February at 2:30.

2                   And -- and, you know, the -- the issues

3   there become, are they -- and I'll enter a Rule 26

4   order on the main case so the parties can engage in

5   whatever discovery you want.

6                   And we're going to resolve the issue at

7   that point whether they have a valid mortgage

8   interest in your home property and whether they

9   have the authority to enforce it.  But if they win

10  on those points, your plan is hopeless.  So just be

11  ready for that.

12                  MR. POFF:  Your Honor, I did just want

13  to point out there is a prior filing on --

14                  JUDGE DUNN:  No.  I'm aware of the

15  prior filing, and I'm assuming that Judge Brown had

16  a similar discussion with Ms. Ha and gave her some

17  time to file a modified plan.  And no modified plan

18  was filed, so the case got dismissed.  I'm not

19  going to waste my time with that at this point

20  because the current schedules on file assume that

21  there is no valid security interest, and so they

22  deal with the unsecured claim problem as I've just

23  described to them.

24                  But if you win, then, of course, the

25  landscapes transform.  Their schedules are totally

1 | wrong and -- as well as their plan not working and
2 | we'll have to start all over from then. But
3 | somehow I don't see them surviving a Chapter 13
4 | without a lawyer's help.
5 | Now, that's just the grim reality.
6 | Chapter 13 is not easy. Congress didn't make it
7 | easy for people to go through Chapter 13. The room
8 | is full of excellent lawyers, so you might talk to
9 | one or two of them before you leave. Everybody in
10 | the Chapter 13 bar is good.
11 | I mean, I'm constantly delighted that I
12 | sit in Oregon because I also sit on the bankruptcy
13 | appellate panel where I hear appeals from other
14 | states in the Ninth Circuit. And I'm always
15 | grateful when I come back here because my bar is so
16 | good.
17 | But you've got to have help. That's
18 | the bottom line, or you're not going to make it.
19 | So it's February 28th at 2:30 for the
20 | evidentiary hearing on Deutsche Bank's objection to
21 | claim, but I've added your subtext that they have
22 | to establish standing through the fact that their
23 | security interest attached and perfected under
24 | Oregon real property law -- and those are terms of
25 | art -- and also that they have the authority to

1  enforce the obligation.

2          And I haven't seen any documentation on

3  this, so I don't know what they're going to show

4  me.  But they're going to have to prove that, but

5  if they prove that, your plan does not work.

6          MR. GODARE:  (Inaudible.)

7          JUDGE DUNN:  Okay.  Mr. Godare, do you

8  have anything in addition?

9          MR. GODARE:  Unless they sell the

10  house.  I suppose there's some --

11          JUDGE DUNN:  They don't want to sell

12  the house.

13          MR. GODARE:  Well --

14          JUDGE DUNN:  That I get.

15          MR. GODARE:  That's the only way the

16  plan would work at that point.

17          JUDGE DUNN:  Right.

18          So do you understand the issues?

19          MS. HA:  We understand the issue; but,

20  however, I think we need more time than beyond

21  February 28th.

22          JUDGE DUNN:  Well, you may -- you know,

23  if -- if you have an attorney there who can advise

24  you -- I mean, the bank's going to have the burden

25  of proof to establish that they have a promissory

1  note and deed of trust securing that note on the

2  property.  And also they're going to have to -- if

3  this loan was securedized and assigned, they're

4  going to have to establish to my satisfaction that

5  it was assigned to them so that they're the entity

6  that has the authority to enforce it.  But if they

7  provide that evidence, then I'm going to find they

8  have standing.  That's what they need to do.

9              So any other questions?

10             I mean, if -- if -- if they establish

11 that and we establish that your plan, you know, is

12 totally unworkable, I'll give you one chance

13 thereafter to -- to amend, but you're going to have

14 to have a lawyer.  If it's just you, I may not

15 extend that chance because you're not going to be

16 able to do it.

17             The -- and I'm -- I'm just going to

18 make a clean records.  The schedules on file in

19 this court -- in this court and the plan you filed

20 show that you don't know what you're doing.  So

21 I'll -- without a lawyer I'm going to assume that

22 condition is going to continue.

23             Any other questions?

24             All right.  Thanks very much.

25             MR. HA:  Thank you, Your Honor.

# Exhibit 8

## IMMEDIATE ATTENTION AND ACTION REQUIRED

*Ha To Ha*
*8230 SE Yamhill Street*
*Portland, OR 97216*

**October 14, 2011**     *SERVED VIA CERTIFIED MAIL, RETURN RECEIPT REQUESTED*

Regional Trustee Services Corporation
c/o Chris Rebhuhn, President
616 1st Avenue, Suite 500
Seattle, WA 98104

Regional Trustee Services Corporation
c/o Michael J. Farrell, Registered Agent
888 SW 5th Ave. #900
Portland, OR 97204

Residential Credit Solutions, Inc.
Research Department
PO Box 163889
Fort Worth, TX 76161-3889

Lindsay, Hart, Neil & Weigler, LLP
Attn: Robert W. Palmer
Suite 3400
1300 SW 5th Avenue
Portland, OR 97201-5640

Aames Funding Corporation
350 S. Grand Avenue, 47th Floor
Los Angeles, CA 90071

Deutsche Bank
Legal Department
60 Wall Street
New York, NY 10005

### (1)NOTICE OF VIOLATIONS OF OREGON TRUST DEED ACT (ORS 86.705 – 86.795); (2) DEMAND TO RESCIND FORECLOSURE PROCEEDINGS INCLUDING TRUSTEE'S SALE SET FOR OCTOBER 27, 2011; (3) QUALIFIED WRITTEN REQUEST; (4) DISPUTE OF VALIDITY OF DEBT and REQUEST TO VERIFY DEBT; (5) NOTICE OF GRIEVANCE UNDER DEED OF TRUST

RE:   Trustee's Sale No:   09-FAA-110341
        Property Address:   8230 Yamhill Street, Portland, OR 97216

To Whom it May Concern:

There is a trustee's sale date set for October 27, 2011 at 11:00am on the property commonly known as 8230 Yamhill Street, Portland, OR 97216 ("Property"). I have been in communication with the "servicer" Residential Credit Solutions, Inc. ("RCSI") and the "trustee" Regional Trustee Services Corporation ("RTSC") for many months concerning the illegal foreclosure. Recently I have discovered further violations of law, and demand you immediately cancel the trustee's sale and rescind all foreclosure proceedings.

This serves as: (1) Notice of Violations of the Oregon Trust Deed Act ("OTDA"), Oregon Revised Statutes 86.705 – 86.795; (2) Demand to Rescind Foreclosure Proceedings Including Trustee's Sale Set for October 27, 2011; (3) QWR under the Real Estate Settlement Procedures Act, 12 U.S.C. §§ 2601 – 2617 ("RESPA"); (4) Notice of Dispute of Validity of a Debt and

Request to Verify Debt under the Federal Fair Debt Collection Practices Act, 15 U.S.C. § 1692 ("FDCPA"); and (5) Notice of Grievance under section 20 of the Deed of Trust, informing you I may seek other corrective action, including judicial review (see Exhibit B at 5). This NOTICE, dated and mailed on October 14, 2011, is hereafter referred to "Notice of OTDA Violations/QWR."

You must notify me immediately that the sale has been cancelled, or at least postponed while the legal issues are resolved, or even litigated should we not be able to reach a mutual agreement.

The response letters I received from RCSI dated June 9, 2011 and September 2, 2011 (Exhibits G and H hereto), are completely inadequate and do not respond to the previous QWR I sent. If those comprise your full and complete response, then you have by acquiescence admitted to all the allegations I made in the (first) QWR, and all the allegations as made in this Notice of OTDA Violations/QWR, unless you respond to all the issues raised herein.

RCSI further states the previous QWR contained "discovery requests" to which no response is required. I object to this notion, and believe that you must respond to all the issues raised and requests made in the first QWR and in this Notice of OTDA Violations/QWR. While this matter is not (yet) in litigation, this Notice of OTDA Violations/QWR (and your response) will be evidence should I have to file a civil complaint or consumer complaint with the Attorney General and/or Oregon Division of Finance and Corporate Securities, Dept of Consumer and Business Services or other agency. Lack of or an inadequate response to this Notice of OTDA Violations/QWR will be evidence of non-compliance by RCSI and RTSC (and the parties on whose behalf they are acting), in violation of the provisions of RESPA, the OTDA and other laws cited herein.

I do not believe that the entity known as "*DEUTSCHE BANK NATIONAL TRUST COMPANY in its capacity as indenture trustee for the Noteholders of AAMES MORTGAGE INVESTMENT TRUST 2005-2*" ("Deutsche Bank Trust") is a valid and true Beneficiary for either the Promissory Note or Deed of Trust. You have failed to adequately respond to my QWR requesting proof of such, and as shown below, the true Beneficiary is unknown and/or unassigned legally. Thus, all the documentation that has been issued in the name of either the Deutsche Bank Trust, or Aames Mortgage Funding Investment Trust 2005-2, is invalid and has been illegally issued/recorded. You must rescind these documents immediately.

The most glaring problem is the "robo-signing" by Mr. Jeffrey W. Gideon, apparently an employee of RCSI, who is signing on behalf of Aames Funding and Deutsche Bank. (See Facts below – Assignment of Deed of Trust and Appointment of Successor Trustee.)

Aames Funding never assigned any mortgage to the "Aames Mortgage Investment Trust 2005-2" ("Aames Trust") for which Deutsche Bank Trust is apparently the "indenture trustee for the Noteholders" of the Aames Trust. However, being a "Noteholder" myself, I do not have any debt to the Aames Trust or Deutsche Bank (or its investors), and Deutsche Bank cannot now claim to the true Beneficiary with standing to foreclose (see below, including *Hooker v. Bank of America* Opinion). How many times has my mortgage been sold/purchased? When? By whom? Were all intervening assignments executed and recorded? You must prove legal standing to

attempt to enforce the provisions of the Deed of Trust, to which Deutsche Bank is not a legal or proper party and thus has no standing. A servicer cannot initiate foreclosure proceedings, only the true Beneficiary has the authority (and further, the "servicer" cannot sign documents in the name of the Beneficiary or Successor Beneficiary in interest, as was done here). In a non-judicial foreclosure in Oregon, you must also record <u>each and every intervening assignment</u>. The true and current "<u>B</u>eneficiary" is unknown. I am invoking the provisions of the OTDA and QWR requiring you to prove standing, provide a complete chain-of-title, and otherwise comply with all state and federal law.

There is no entity known as "LINDSAY HART<u>E</u> LAW OFFICE" which is the "named" Trustee in the Deed of Trust, and from whom the authority of Successor Trustee was appointed to RTSC (improperly and illegally). Lindsay Hart<u>e</u> is not and was not <u>ever</u> a business entity in Oregon (see Exhibit I). There is a law firm in Oregon known as "Lindsay, Hart, Neil & Weigler, LLP[1]" but there is <u>not</u> a "Lindsay Hart<u>e</u> Law Office" that has ever been registered to conduct business in Oregon. Thus, there never was or is a proper "Trustee." If there was not a Trustee, the powers of the trustee cannot be appointed from a (non-existent) trustee to another entity. In effect, the Deed of Trust is null due to the improper naming of the "Trustee" – a breach of the Deed of Trust by Aames Funding. The Appointment of Successor Trustee is also null and void based on this reason, as is every other document that contains the name of "Lindsay Harte Law Office" as the "Trustee" in this matter.

Attached in support of this Notice are the following documents (or excerpts of the document):

- Exhibit A – Adjustable Rate Note dated April 18, 2005

- Exhibit B – Deed of Trust recorded April 27, 2005   (Mult Co No. 2005-074270)

- Exhibit C – Assignment of Deed of Trust recorded June 23, 2010 (No. 2010-077497)

- Exhibit D – Appointment of Successor Trustee recorded June 23, 2010
      (No. 2010-077498)

- Exhibit E – Notice of Default and Election to Sell recorded June 23, 2010
      (No. 2010-077499)

- Exhibit F – Notice of Default and Election to Sell recorded June 21, 2011

- Exhibit G – Response of RCSI dated June 9, 2011

- Exhibit H – Response of RCSI dated September 2, 2011, envelope mailed Sept 23, 2011,
      and payment history for Chris Wallace,

- Exhibit I – Oregon Corporation Division Business Search printouts

---

[1] I am copying this law firm because of the similar name; however, I do not concede that the name given in the Deed of Trust and all foreclosure documentation, "Lindsay Harte Law Office" is a legitimate entity or trustee at any time herein.

The entities listed above (and perhaps others) are in violation of several provisions of the Oregon Trust Deed Act governing non-judicial foreclosure proceedings. You are in violation of many state and federal laws that are not discussed in this letter; however, you are in direct violation of RESPA, the OTDA (ORS 86.705 – 86.795), the Federal Fair Debt Collection Practices Act, 15 U.S.C. § 1692 ("FDCPA"), the Oregon Unlawful Trade Practices Act, ORS 646.605, *et seq* ("UTPA") including "unlawful collection practices" (ORS 646.639, *et seq*), perhaps even the Truth in Lending Act ("TILA"), and perhaps other state and federal laws. Should I be forced to litigate this matter, I reserve my right to bring any additional claims or issues upon further research and discovery of additional information and documentation. This Notice provides proper Notice of Grievance and other notice requirements prior to the filing of a lawsuit.

**YOUR URGENT ATTENTION IS REQUIRED.** Please contact me within five (5) days and advise as to the status of the foreclosure proceedings and if you have cancelled the October 27, 2011 sale. If I do not have a definitive resolution to this Notice of Violations/QWR and Demand to Cancel Foreclosure Proceedings by **Friday, October 21, 2011**, I will be forced to file a verified complaint in the United States District Court for the District of Oregon or Clackamas County Circuit Court, and request for injunctive relief in the form of a Temporary Restraining Order ("TRO") and/or Preliminary Injunction, or file for protection under the bankruptcy court.

Please advise if you have local representation in Oregon so I can communicate with that law firm or attorney should I need to file the Complaint, and advise them as to the hearing time and date of the Motion for TRO and Preliminary Injunction proceedings. I vehemently object to the assertion by RCSI (Exhibit H) that I may be charged for your "legal staff's time ($85/hour) in complying with more complex requests." RCSI has absolutely no legal right to make such a claim, under RESPA, any other statute, or contractual provision. You must respond to every issue in this notice, and provide adequate documented evidence to support your claims, at no cost to me – in fact, you have already (illegally) overcharged for "foreclosure fees" – see below regarding ORS 86.753 and $1,000 cap you are breaching (and illegally threatening to charge me more than you are already illegally charging at this time!). The foreclosure proceeding is invalid and illegal, and I dispute all foreclosure-related costs incurred before or after this date.

This letter is giving you notice that I will seek injunctive relief should you not cancel the foreclosure proceedings, as required by FRCP 65 and ORCP 79B. These rules state a court may issue a temporary restraining order upon a showing of "immediate and irreparable injury, loss, or damage will result" from the action and that I give proper notice, or state why such notice should not be required. This letter constitutes such notice under FRCP 65 and ORCP 79B, as well as the "Grievance Notice" as required under the Deed of Trust.

This Notice is an attempt to avoid litigation and damages to me created by RCSI, RTSC, Deutsche Bank Trust, Aames Funding Corporation, Aames 2005-2 Trust, Lindsay Harte Law Office, etc. (all the entities listed in the illegal foreclosure-related documentation). The trustee's sale is illegal and must be stopped at once to avoid further action. These entities have persisted with the intention to exercise the "power of sale clause" even though such rights were never legally transferred through state and county laws and as specified in the OTDA (ORS Chapter 86), UCC Article III, as well as many longstanding Oregon laws and precedential rulings.

4

The "Beneficiary" in this matter has not been proven. Further, documentation required to be recorded has never occurred and I have strong reason to believe there are many other violations of federal and state law. Should I file the lawsuit, proof of these facts will be sought in discovery, and your own documentation will certainly prove violations of the ODTA and UCC (as shown in the attached Exhibits), but may also reveal further misconduct and even fraudulent actions. Please be advised this is a very serious matter of the utmost importance – obviously to me because it is my home, but also to your firms (and the firms you are acting on behalf) because you face severe liability should this matter continue to the filing of a lawsuit and subsequent discovery.

As shown below, all the foreclosure-related documents have problems and illegalities, including the Assignment of Deed of Trust and Appointment of Successor Trustee leading up to the final and operative Notice of Default. This letter will not exhaust every problem with these documents, but will show the violations of the OTDA based on the documentation issued and recorded (or not recorded) by RCSI on behalf of all the parties in this matter. RTSC, as the "Trustee," is supposed to be a "neutral third-party" of which it is not – it is acting solely on behalf of a (so-called) "beneficiary" (which is not even the true Beneficiary!).

As you may be aware, the U.S. District Court of Oregon has recently issued several TROs and Opinions[2] thereon, in favor of the homeowner Plaintiff and against the bank/lender/trustee Defendants, for issues very similar to the facts in my mortgage, "servicing" of the mortgage, the mortgage-backed security scheme, and the many issues concerning the non-judicial foreclosure processes and other illegal activities. These TROs have been issued on a $500 bond and became permanent injunctions pending the litigation. Bank of America is spending tens of thousands of dollars losing and then appealing the Opinion in *Hooker* where Judge Panner dismissed the illegal non-judicial foreclosure.

I am hoping to avoid unnecessary time, expense and mostly emotion by the filing an action in USDC Oregon. You must cancel the sale and discuss settlement options with me, or face litigation and likely have to have a judicial foreclosure/reformation of deed action. I am prepared to fight until final resolution by the Court, or to settle this matter, perhaps through a loan modification.

The violations of the OTDA outlined herein are sufficient to require you to rescind the foreclosure proceedings and cancel any further foreclosure sale dates. If you do not cancel it, then I will ask the Court for the TRO and seek my legal costs and fees, as well as any available penalties including punitive damages.

---

[2] These Opinions include: (1) *Rinegard-Guirma* v. *Bank of America,* No. 10-CV-1065-PK, 2010 WL 3655970 (D. Or. September 15, 2010); (2) *Burgett* v. *MERS, 2010* WL 4282105 (D. Or. October 20, 2010); (3) In re: *McCoy, 2011 WL 477820* (Bankr. D. Or. February 7, 2011); (4) *Ekerson* v. *MERS,* No. 11-CV-178-HU (D. Or. February 11, 2011); (5) *Barnett* v. *BAC Home Loan Servicing,* 2011 WL 723046 (D. Or. February 23, 2011); (6) *Hooker v. Northwest Trustee Svcs,* No. 10-3111-PA (D. Or. May 25, 2011); and (7) in the 9th Circuit Court of Appeals: *In re: Veal,* No. AZ-10-1055 (BAP June 10, 2011).

## QUALIFIED WRITTEN REQUEST and
## NOTICE OF DISPUTE OF VALIDITY OF DEBT

I am again requesting under the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. §§ 2601 – 2617 that you properly respond to this Qualified Written Request ("QWR") as provided in 12 U.S.C. §2605(e) and outlined herein. I am also providing notice of my dispute of the validity of the debt as allowed under the FDCPA §1692g, to which you must provide a proper and complete verification of the debt as being a valid debt, including all the requested information concerning the true Beneficiary, chain-of-title of the Deed of Trust and tracing of the history of the ownership and possession of the Note, etc., as well as showing compliance with the provisions of the OTDA and beneficial interest, proper trustee, etc. as alleged herein.

You must provide information relating to the servicing of the loan and provide a written response acknowledging receipt of this QWR within 20 days[3] (excluding legal public holidays, Saturdays, and Sundays), unless the action requested herein is taken within such period. The requested action is a full and complete response to this Notice, including providing a response and documentation as requested herein, and that you show proof of standing to attempt to collect upon an alleged debt of an unknown and unauthorized creditor.

**Until such time the debt has been properly "validated" and the QWR fully addressed, you must cease and desist from any and all collection activities against me, including cancellation of all foreclosure activities, and the October 27, 2011 trustee's sale.**

This QWR is written and provides the (i) name and account of the borrower; and (ii) includes a statement of the reasons the entity you list as the "creditor" (the Deutsche Bank Trust) is not the true and valid Creditor to whom any debt is owed. This Trust entity is not the beneficiary of the Mortgage, or a party properly assigned beneficial interest. Thus, neither the Deutsche Bank Trust, nor RCSI, nor the Aames Trust are valid creditor(s), and another party cannot attempt to act for an unknown and unassigned "Creditor." The proper Creditor must show proof of standing to seek to enforce the Note and/or Deed of Trust (the "Mortgage"). You have not provided such and thus lack standing.

I am requesting the true "Creditor" provide for my inspection the original Note, Deed of Trust and any Allonge(s), applicable portions of the Pooling Service Agreement (PSA) governing the Deutsche Bank Trust or the Aames Trust, documentation filed with the SEC, IRS or other governmental agencies concerning both Trusts (such as names of security holders, tax statements, capital and interest balance sheets, etc. in relation to my Mortgage and Note).

I am further requesting documentation proving ownership and any and all proof of chain of title, proof of proper endorsement of the Note under the provisions of the PSA (and compliance with the UCC and all applicable laws), all documentation recorded in any county including any County Recorder's Office within the state of Oregon, as well as a full and accurate accounting of our Mortgage within the guidelines of the Generally Accepted Accounting Principles.

---

[3] This time period is obviously shortened concerning the cancellation of the sale, which is less than 20 days. The timelines for you to respond to the QWR remain as in the statute, but the sale cancellation must be immediate.

You must respond within 60 days of receipt of this QWR, excluding legal public holidays, Saturdays, and Sundays. You cannot take any action with respect to this inquiry until you:

(A) make appropriate corrections in the account of the borrower, including the crediting of any late charges or penalties, and transmit to the borrower a written notification of such correction (which shall include the name and telephone number of a representative of the servicer who can provide assistance to the borrower);

(B) after conducting an investigation, provide the borrower with a written explanation or clarification that includes—

(i) to the extent applicable, a statement of the reasons for which the servicer believes the account of the borrower is correct as determined by the servicer; and
(ii) the name and telephone number of an individual employed by, or the office or department of, the servicer who can provide assistance to the borrower; or

(C) after conducting an investigation, provide the borrower with a written explanation or clarification that includes—

(i) information requested by the borrower or an explanation of why the information requested is unavailable or cannot be obtained by the servicer; and
(ii) the name and telephone number of an individual employed by, or the office or department of, the servicer who can provide assistance to the borrower.

I am making and providing this Notice under the applicable provisions outlined above. You are hereby being put on Notice that you if you do not respond within 60 days[4] of receipt of this Notice, you will be in Default for non-response to our legally binding dispute of the alleged debt under RESPA, the FDCPA and other laws cited herein, and as provided in this Qualified Written Request ("QWR") and Notice of Dispute of Debt and Request for Validation of Debt, for failure to validate the debt you claim I owe.

I dispute the validity of debt you allege I owe, and until you respond to the request to verify the debt, you must cease and desist from any further collection activities, and remove any negative marks on my credit score with the major credit bureaus. You must provide proof that you have removed any and all negative marks. As of the date of this Notice, the alleged debt you claim I owe does not exist, and any further attempts to collect upon it constitutes an illegal attempt by a debt collector to collect upon a debt that is not due. This is also Notice to cease and desist from any further collection activities against me, and Notice of civil liability for any continued violations of illegal collection activities.

---

[4] While the statutory timeline is 60 days to respond, the sale cancellation must be immediate, pending your response to this Notice, QWR, and all legal issues are resolved.

## FACTS RELEVANT TO VIOLATIONS OF OTDA – ORS 86.705 – 86.795

Upon careful review of the documentation, there are many problems, and ultimately the true "Beneficiary" has not been properly assigned. Thus, the "Beneficiary" is unknown at this time. Assignment(s) were made by parties who were not at the time the "Beneficiary" themselves, nullifying that particular Assignment. Assignments that should have been recorded have not been properly recorded. Each successive Assignment is defective, based on the previously unrecorded or unexecuted "Assignment" of the Note and/or Deed of Trust (which cannot be split – see *Hooker* Opinion below). The (final) Assignment that was recorded is not valid because it is made by an entity without the authority to make the Assignment, i.e, made by a party who is not the Beneficiary or Successor Beneficiary in Interest. All intervening assignments have not been executed or recorded. The Assignment moreover was "robo-signed" – see below.

Because the Assignment is not legal, the Appointment of Successor Trustee is not valid because it was made by a party who was not the true Beneficiary. Thus, all actions taken by the Successor Trustee (RTSC) are invalid. It should further be noted that RCSI was acting on behalf of both the Assignor and Assignee of the Assignment of Deed of Trust, as well as signing for the "new" Beneficiary to appoint a Successor Trustee. There are two (2) conflicts of interest here. The "trustee" which is listed as "Lindsay Harte Law Office" on several documents, is not a known entity that could have or can today conduct business in the state of Oregon, and certainly cannot appoint a successor-in-interest as the "Trustee" (which it is not).

### NOTE/DEED OF TRUST:
On or about April 18, 2005 an Adjustable Rate Note ("Note") was executed, naming the "Lender" and "Note Holder" as Aames Funding Corporation DBA Aames Home Loan, 350 South Grand Avenue, 47th Floor, Los Angeles, CA 90071. (Exhibit A.) The Note was secured by the Deed of Trust recorded April 27, 2005 ("DOT"), naming the same entity as "Lender" and myself as the "Borrower." (Exhibit B[5].) The DOT defines the "Trustee" as "Lindsay Harte Law Office." (Ex. B at 2.)

Section 20 of the DOT provides procedures for a party to issue a "Notice of Grievance" prior to commencing any judicial action that arises from a breach of the DOT, which I am alleging you have committed. I am giving you "a reasonable period" to respond and make corrective action. Section 22 of the DOT contains the Acceleration and Remedies clause, stating the "Lender" or "Trustee" may invoke the "power of sale," not a misplaced and improper "beneficiary" as is the case here. The power of sale clause has been breached by the "Lender" or "Note Holder" or "Trustee" (or any agent acting on their behalf), and these parties are in violation of the Oregon Trust Deed Act (see sections on "Beneficiary" and "Trustee" definitions, requirements, etc. as found in ORS 86.705, *et seq*, and as interpreted by Judge Panner in the *Hooker* Opinion.)

I made payments to Aames Funding from June, 2005 through April, 2009. I then was informed to make payments to a new servicer, RCSI, beginning May, 2009. The payments are currently to be payable and sent to RCSI.

---

[5] Tax statements were to be sent to Aames Funding (as required by Oregon law for recording of such documents). I am requesting you identify the entity or entities registered with the IRS and Oregon Dept of Revenue concerning any tax-related filings that involve my Mortgage or Property in any manner.

**ASSIGNMENT OF DEED OF TRUST/APPOINTMENT OF SUCCESSOR TRUSTEE:**
An Assignment of Deed of Trust was recorded on June 23, 2010, from the "undersigned" Aames
Funding Corporation[6] DBA Aames Home Loan, by Jeffrey W. Gideon, Vice President, to the
Deutsche Bank Trust (for the "Noteholders" of the Aames Trust). I am listed as the Grantor, and
again "Lindsay Harte Law Office" is the named "Trustee." The Assignment was made in
initiation of foreclosure proceedings. (Exhibit C.)

Also on June 23, 2010, an Appointment of Successor Trustee was recorded (Exhibit D.) It is
signed by Deutsche Bank Trust… Aames Trust, "By RESIDENTIAL CREDIT SOLUTIONS its
Attorney in Fact[7]" and contains the signature of the same Jeffrey W. Gideon, Vice President.
This document lists "LINDSAY HARTE LAW OFFICE" as the "Trustee" and appoints RTSC
as the "Successor Trustee."

Apparently, Mr. Gideon works for both Aames Funding Corporation (the initial "beneficiary"
who signed away beneficial interest to another party), and he works for Residential Credit
Solutions, the servicer of the "new" beneficiary, Deutsche Bank Trust. Even if he were working
for both, which he is not (he likely works for RCSI), he is signing on behalf of the "old" and the
"new" beneficiary (serious conflict and ethical violation), making both the Assignment of Deed
of Trust and Appointment of Successor Trustee invalid (and "robo-signed" as so prevalent in the
news and investigations by all 50 Attorneys General, the Office of the Comptroller of the
Currency, the Federal Reserve, FDIC, etc. – this is the very activity banks, servicers, trustees,
etc. are being fined and that homeowners are winning in state and federal courts nationwide, but
especially in USDC Oregon – see list of Opinions above).

Not only is the "Beneficiary" unknown, improper, illegally designated, but the "Trustee" is an
entity that never has been in existence as explained above. The foreclosure documentation is
riddled with errors and illegalities. I may seek punitive damages if I further discover "fraud" on
behalf of any party.

There is also question as to whether (and when) Mr. Gideon signed the Appointment – the date is
scribbled out and a new date inserted, with an asterisk (*) stating an "effective" date of the
document. This is very confusing and provides further evidence of "robo-signing" activities.
Both the Assignment of the DOT and the Appointment of Successor Trustee are notarized by the
same person, Amy McQueen. (*Compare Exhibit C at 2 and Exhibit D at 2.*) This is not only
illegal, it is very improper for a "so-called" neutral third-party (the "Trustee") to be "forging"
documents on behalf of an entity (Aames) that was defunct around 2007 (see Exhibit I at 3).
Further, the prior documentation I sent to Aames, at the Los Angeles address, has been returned
as "UNDELIVERABLE" to that address. I do not believe Aames was in business in June, 2010

---

[6] Aames Funding Corporation had a "withdrawal of authority" to conduct business in the state of Oregon as of
October 5, 2007 (see Exhibit I.) Aames Funding was not allowed to have this document recorded and "Lindsay
Harte Law Office" is not an entity whatsoever – thus, neither the "Beneficiary" assigning the beneficial interest, nor
the "Trustee" are valid and legal entities in Oregon when this was signed and/or recorded.

[7] I am requesting documentation or written confirmation that RCSI can act on behalf of any other party, including
Deutsche Bank Trust, and the governing PSA concerning "power of attorney" arrangements.

when Mr. Gideon signed as a "Vice President" of Aames Funding Corporation. Mr. Gideon is obviously an employee of Residential Credit Solutions, Inc. and "forged" a document by signing as "Vice President" of Aames Funding Corporation dba Aames Home Loan.

The "Research Department" at RCSI should investigate how many state and federal violations of law are contained in Exhibits C and D alone. Of course, at your own expense – I still cannot believe you said you will charge me for research... especially since you have violated the $1,000 foreclosure costs cap – see below.

In the Assignment, Mr. Gideon, or RCSI, is both the Assignor and the Assignee. Mr. Gideon, or RCSI, is both "Aames Funding" and "RCSI" as "Attorney in Fact" for Deutsche Bank Trust for the Aames Trust.

Further, a "Trustee" cannot act also be a "Beneficiary" or be able to assign the interest of the Beneficiary. A "Beneficiary" is the successor in interest if assigned. See definitions for the OTDA in ORS 86.705:

> (1) "Beneficiary" means the person named or otherwise designated in a trust deed as the person for whose benefit a trust deed is given, or the person's successor in interest, and who shall not be the trustee unless the beneficiary is qualified to be a trustee under ORS 86.790 (1)(d).

> (6): "Trustee" means a person, other than the beneficiary, to whom an interest in real property is conveyed by a trust deed, or such person's successor in interest. The term includes a person who is an employee of the beneficiary, if the person is qualified to be a trustee under ORS 86.790.

Only a properly appointed Successor Trustee is vested with the powers of the original Trustee (see ORS 86.790(3)). RTSC was not properly appointed as Successor Trustee because the "Beneficiary" appointing RTSC was not the true "Beneficiary" or successor to the true Beneficiary. The Appointment is also not valid for the reasons given herein.

## NOTICE OF DEFAULT AND ELECTION TO SELL:
A Notice of Default and Election to Sell ("NOD") was recorded on June 23, 2010[8] (Exhibit E) giving a sale date of October 27, 2010.  A nearly identical NOD was recorded June 21, 2011, giving the current sale date of October 27, 2011.  (Exhibit F.)

These documents state the improper "Trustee" as Lindsay Harte Law Office, the improper "Beneficiary" as Aames Funding, in violation of ORS 86.705, 86.735, 86.740, 86.745, 86.753 and 86.790 (and likely other portions of the OTDA). You must comply with each and every one of the procedures outlined in the OTDA, and you have violated several. However, even though I am alleging many violations of law, a violation of even one of these laws invalidates the entire foreclosure proceedings. You must immediately rescind all the foreclosure documentation.

---

[8] This NOD is nearly identical to the operative NOD dated June 21, 2011, except for the "Amount due" and calculations and dates. All of the errors, omissions and illegal procedures are the same for both NODs (and both are invalid).

The primary statute violated herein is **ORS 86.735**, "Foreclosure by advertisement and sale: which provides the following:

> "The trustee may foreclose a trust deed by advertisement and sale in the manner provided in ORS 86.740 to 86.755 if: (1) The trust deed, <u>any assignments of the trust deed by the trustee or the beneficiary and any appointment of a successor trustee are recorded</u> in the mortgage records in the counties in which the property described in the deed is situated." (ORS 86.735(1); emphasis added.)

You have not properly recorded all assignments of the trust deed or properly appointed a successor trustee. The "Beneficiary" as appointed is unknown; further the Notice of Default lists the original Beneficiary and not the current "Beneficiary" (because it is unknown). The USDC Oregon Opinions have made several legal conclusions that the current or present Beneficiary and present Trustee must be the party seeking to foreclose (see below).

The Notice also improperly states that "[b]y reason of said default, the beneficiary has declared <u>all sums owing on the obligation</u> secured by said trust deed <u>immediately due and payable, said sums being the following: UNPAID PRINCIPAL BALANCE OF $195,058.93</u>, PLUS interest…" (Exhibit F at 1.)

This is illegal and in violation of ORS 86.753 regarding the "default amount" and what is due to stop the sale and bring the loan current or "reinstated." ORS 86.753 states: "[i]f the default consists of a failure to pay, when due, sums secured by the trust deed, <u>the default may be cured by paying the entire amount due at the time of cure under the terms of the obligation, **other than such portion as would not then be due had no default occurred**.</u>" The Notice of Default is misleading in that it states the entire balance of $195,058.93 is due (plus interest, fees, etc.). Although the Notice of Default states that this "default amount" can be paid at any time prior to five (5) days before the sale date (as stated in ORS 86.753), the Notice of Default is confusing.

You are also in violation of ORS 86.753(1)(a) which states the maximum amount allowed for "foreclosure costs" (including attorneys' fees) is **$1,000**. You have already included **$2,555.91** for "Beneficiary Advances" which I am unsure as to these costs. I am not paying for <u>any</u> foreclosure costs because I believe they are all illegal. I am requesting a complete and itemized accounting of all the "Beneficiary Advance" charges.

The overstatement of the "default amount" (of $195,058.93) and the overstatement of the allowed maximum foreclosure costs (by over 250% - $2,555.91 compared to $1,000.00 max) are both false attempts to collect on a debt which I do not owe. You in violation of the FDCPA, 15 U.S.C §1692e, "False or Misleading Representations" wherein "a debt collector may not use any false, deceptive, or misleading representation or means in connection with the collection of any debt…. the false representation of… the character, amount, or legal status of any debt." This is also a violation of ORS 646.639(2), "Unlawful Collection Practices" stating that it is "an unlawful collection practice for a debt collector, while collecting or attempting to collect a debt to do any of the following: … Represent that an existing debt may be increased by the addition of attorney fees, investigation fees or any other fees or charges when such fees or charges may

not legally be added to the existing debt.... Collect or attempt to collect any interest or any other charges or fees in excess of the actual debt unless they are expressly authorized by the agreement creating the debt or expressly allowed by law."

The FDCPA allows for a $1,000 penalty, plus my legal fees and costs. I may seek punitive damages, for the "unsafe and unsound banking practices" and the "robo-signed" and forged documents illegally recorded in an attempt to "steal" my home. I have been violated by these banks and have had significant distress over this matter for many months. The standard for punitive damages is that one must prove "by clear and convincing evidence that the party against whom punitive damages are sought has acted with malice or has shown a reckless and outrageous indifference to a highly unreasonable risk of harm and has acted with a conscious indifference to the health, safety and welfare of others." (ORS 31.730(1).)

## QWR/RCSI RESPONSES:

I sent a QWR to RCSI, RTSC and Aames Funding. The Aames envelope was returned as non-deliverable. I received two responses from RCSI, attached as Exhibits G and H, dated June 9, 2011 and September 2, 2011. Both letters claim my QWR was not being treated as such, and that RCSI "cannot find reference to a specific allegation of inaccurate servicing." This Notice of Violations/QWR provides many "specific allegations" relating to "inaccurate servicing" and "illegal foreclosure proceedings" – you must respond. Both the RCSI letters state they attach a "payment history" – the first one does, the second one does not (see below).

The letter dated "September 2, 2011" was not mailed to me until September 23, 2011 (see copy of envelope with postmark and date of letter showing through the window, along with my name and address, Exhibit H at 1). This letter is likely supposed to be dated September 22, 2011, based on the postmark, and also because this letter encloses a letter dated September 22, 2011 to someone named "Chris Wallace, 4211 Clearview Dr., Douglasville, GA, 30134" and attaches a "payment history" for him, not me (see Exhibit H at 4-5). This shows the complete lack of oversight, risk assessment and risk management, lack of ethics, and a "rush" to get the documents out the door, without reviewing the file, yet swearing to the authenticity of the documents, the beneficiary, trustee, etc.

This matter is riddled with mistakes and procedural errors, not to mention outright violations of law and possibly even fraud (for the forged document). The Opinion by Judge Panner (see below) admonishes banks and servicers such as RCSI and RTSC for such illegal activity. I would certainly be able to obtain a TRO based on the face of your own documentation.

## CORPORATE STATUS:

The attached printouts from the Oregon Secretary of State, Corporation Division, Business Name Search, reveals no entity found for "LINDSAY HARTE" (Exhibit I at 1). The Exhibit also shows that Aames Funding Corporation had a "withdrawal of authority" to conduct business in Oregon as of October 5, 2007 (see Exhibit I at 3). For the reasons stated herein, I do not believe Aames Funding was even in existence as of June 18, 2010, when the "Assignment" was signed by Mr. Gideon for "AAMES FUNDING CORPORATION DBA AAMES HOME LOAN" (Exhibit C at 2). Mr. Gideon has engaged in "robo-signing" activities. This is illegal and nullifies each and every document.

## USDC OPINIONS

In an Opinion dated May 25, 2011 by Judge Owen M. Panner in USDC Oregon, in
HOOKER v. NORTHWEST TRUSTEE SERVICES, BANK OF AMERICA, N.A. and MERS,
Oregon Civ. No. 10-3111-PA, the Court found they did not prove chain of title, the proper
beneficiary is not named or properly assigned by recording documents, the non-judicial FC
proceeding violated Oregon Trust Deed Act, many of the foreclosure proceedings coming before
this Judge are problematic, and dismissed the non-judicial FC proceeding. (See Footnote above
for other Opinions).

Judge Panner made the following statements:

1) Order at 7: "The problem that defendants run into in this case is an apparent <u>failure to
   record assignments necessary for the foreclosure</u>." Citing to *Burgett v. MERS*, 2010 WL
   4282105, at \*3 (D. Or. Oct. 20); see also *In re: McCoy*, 2011 WL 477820, at \*3-4
   (Bankr. D. Or. Feb. 7).

2) Order at 7: Discussion regarding "Note Holder" in FN2, and that "the person for whose
   benefit the trust deed was given… is the beneficiary in the trust deed." Citing to ORS
   86.705(1) and *McCoy*.

3) Order at 8: The Oregon Trust Deed Act's "recording requirements mandate the recording
   of any assignments of the beneficial interest in the trust deed." See *Burgett* at 2 and
   *McCoy* at 3. "<u>The Oregon Trust Deed Act requires the recording of all assignments by
   the beneficiary</u>."

4) Order at 8: "Oregon's recording requirement is consistent with the <u>longstanding rule that
   the trust deed or mortgage generally follows the note</u>."

5) Order at 9: "If there were transfers of the beneficial interest in the trust deed, defendants
   were required to record those transfers prior to initiating a non-judicial foreclosure in the
   manner provided in ORS 86.740 to 86.755. ORS 86.735(1)."

6) Order at 9: "Plaintiffs allege sufficient facts to make clear that <u>defendants violated the
   Oregon Trust Deed Act by failing to record all assignments of the trust deed</u>…. Motion to
   dismiss DENIED… Plaintiffs are entitled to declaratory relief [dismissing non-judicial
   foreclosure]."

7) Order at 10: "Defendants' chain of title submission therefore demonstrates that
   <u>defendants violated ORS 86.735(1) by initiating non-judicial foreclosure proceedings
   prior to recording all assignments of the trust deed</u> in the Jackson County land records."

8) Order at 10: Plaintiff's failure to not make any payments on the note since September,
   2009 "does not permit defendants to violate Oregon law regulating non-judicial
   foreclosure… [Oregon law enacted to] protect grantors from the unauthorized foreclosure

13

and wrongful sale of property... a party conducting a non-judicial foreclosure must demonstrate strict compliance with the Act."

9) Order at 11-12: Concerning the chain of title summary submitted by MERS: "raises additional concerns relevant to numerous cases pending before me... the 'out-of-order' recordings demonstrate problems, not atypical in my view, often caused by foreclosing parties rushing to expedite non-judicial foreclosures."

10) Order at 13-14: Regarding foreclosure by advertisement and sale outside of judicial review: "necessarily relies on the foreclosing party to accurately review and assess its own authority to foreclose... given the numerous problems I see in every non-judicial foreclosure case I preside over, a procedure relying on a bank or trustee to self-asses its own authority to foreclosure is **deeply troubling me**."

11) Order at 14-15: Discussing the securitization of home loans, passing off loans to investors quickly... "makes it much more difficult for all parties to discover who 'owns' the loan... a lender that knows it will immediately sell a loan on the secondary market has no incentive to ensure the appraisal of the security is accurate. Similarly, the lender need not concern itself with the veracity of any representations made to the borrower... The requirement under Oregon law that all assignments be recorded prior to a non-judicial foreclosure is sound public policy."

12) Order at 16: "the concerns raised in this order appear in many foreclosure cases pending before me... I agree... that Oregon law permits foreclosure without the benefit of a judicial proceeding only when the interest of the beneficiary is clearly documented in public record. In re McCoy at 4. Because defendants failed to record all assignments of the trust deed, the non-judicial foreclosure proceedings violated the Oregon Trust Deed Act. Therefore, plaintiffs are entitled to declaratory relief on that claim.

As I have informed you previously, you are in the same violations of law as stated by Judge Panner. I am sure your legal department has reviewed these Opinions as well as the other investigations being conducted by Federal and State Authorities, and the penalties for "unsafe and unsound foreclosure activities." (See Order issued by the Department of Treasury, Office of the Comptroller of the Currency to many banks and servicers for general findings on such illegal activities).

There are similar facts and issues of law in this matter as stated in the *Hooker* Opinion. You are committing illegal foreclosure activities upon me and I demand you to cease and desist from these proceedings, and cancel the current sale you have scheduled.

## DEMAND FOR RESCISSION OF DEFAULT

You must immediately rescind the Notice of Default recorded June 23, 2011, cancel the October 27, 2011 sale date, and take me out of "default" status because I am not in default with any entity currently seeking to enforce the Note or Deed of Trust on the Property, as shown herein. The current and true "Beneficiary" is unknown; until that party proves its standing and authority to attempt to collect on the Note and enforce the sale provisions of the Deed of Trust, there is no "Beneficiary." As such, there is no true and known "Creditor." Because there is no known Creditor, there is no party to which I owe any debt (and certainly not the parties presently seeking to foreclose on a mortgage they do not own or have authority to seek to foreclose or to seek to collect upon an alleged debt which they are not the creditor). Thus, you must remove me from default status.

Any act on behalf of the alleged creditor(s) to enforce a claim against me must be brought before a court, wherein proof of claim is clearly demonstrated by producing acceptable evidence of chain of title, proof of ownership of the mortgage and/or note, establishment of a "true beneficiary," properly recorded documentation and assignments, etc. Your non-judicial foreclosure proceeding is in violation of several provisions of the Oregon Trust Deed Act, as shown in this Notice. You must comply with all the requests herein, the QWR, the Dispute of Debt and Request to Verify as a Valid Debt, and also have notice of grievance and notice of violations of the law. You must take corrective action immediately or I will seek any and all damages available to me under state and federal law, including punitive damages.

**YOUR IMMEDIATE ATTENTION TO THIS MATTER IS REQUIRED. LACK OF ACTION ON YOUR BEHALF MAY RESULT IN "IMMEDIATE AND IRREPARABLE INJURY, LOSS OR DAMAGE" TO ME BY THE "GRIEVIOUS INJURY" OF THE LOSS OF MY HOME, AND UPON WHICH I WILL SEEK INJUNCTIVE RELEIF IF I DO NOT HEAR FROM YOU BY OCTOBER 21, 2011.**

Thank you for your time and professional courtesies.

Respectfully submitted this 14th day of October, 2011

_____

Ha To Ha

## CERTIFICATE OF SERVICE

I hereby certify that I caused to be served the **(1)NOTICE OF VIOLATIONS OF OREGON TRUST DEED ACT (ORS 86.705 – 86.795); (2) DEMAND TO RESCIND FORECLOSURE PROCEEDINGS INCLUDING TRUSTEE'S SALE SET FOR OCTOBER 27, 2011; (3) QUALIFIED WRITTEN REQUEST; (4) DISPUTE OF VALIDITY OF DEBT and REQUEST TO VERIFY DEBT; (5) NOTICE OF GRIEVANCE UNDER DEED OF TRUST** upon the following:

Regional Trustee Services Corporation                Cert Mail No. 7011 1570 0003 2128 3249
c/o Chris Rebhuhn, President
616 1st Avenue, Suite 500
Seattle, WA 98104                                     (also emailed to dmarics@rtrustee.com)

Regional Trustee Services Corporation                Cert Mail No. 7011 1570 0003 2128 3256
c/o Michael J. Farrell, Registered Agent
888 SW 5th Ave. #900
Portland, OR 97204

Residential Credit Solutions, Inc.                   Cert Mail No. 7011 1570 0003 2128 3263
Research Department
PO Box 163889
Fort Worth, TX 76161-3889                            (also faxed to: 877-415-5051)

Lindsay, Hart, Neil & Weigler, LLP                   Cert Mail No. 7011 1570 0003 2128 3270
Attn: Robert W. Palmer
Suite 3400
1300 SW 5th Avenue
Portland, OR 97201-5640

Aames Funding Corporation                            Cert Mail No. 7011 1570 0003 2128 3287
350 S. Grand Avenue, 47th Floor
Los Angeles, CA 90071

Deutsche Bank                                        Cert Mail No. 7011 1570 0003 2128 3294
Legal Department
60 Wall Street
New York, NY 10005

By mailing the this document via Certified Mail, Return Receipt Requested, addressed to the parties listed above, and deposited with the U.S. Postal Service at Portland, Oregon, on the date set forth below.

Dated this 14th day of October, 2011

_____

Ha To Ha

*Ha To Ha*
*8230 SE Yamhill Street*
*Portland, OR 97216*

SERVED VIA CERTIFIED MAIL, RETURN RECEIPT REQUESTED, NO. 7008 0150 0002 4585 0182

August 30, 2012

Regional Trustee Services Corporation
616 1ˢᵗ Avenue, Suite 500
Seattle, WA 98104

## DISPUTE OF VALIDITY OF DEBT and REQUEST TO VERIFY DEBT UNDER FEDERAL FAIR DEBT COLLECTION PRACTICES ACT ("FDCPA"), 15 USC §1692

RE:    Trustee's Sale No:    09-FAA-120980
       Property Address:     8230 Yamhill Street, Portland, OR 97216

To Whom it May Concern:

I am in receipt of your August 7, 2012 Notice required by the Federal Fair Debt Collection Practices Act, 15 U.S.C. § 1692 ("FDCPA"). I am hereby giving official Notice of Dispute of the Validity of a Debt and Request to Verify Debt under the provisions of the FDCPA governing disputes of debts.

I dispute the validity of the amount of the alleged debt as being $231,190.59 as of the date of the Notice, or the cure amount of $45,302.07. These amounts are incorrect and must be verified as valid debts, including the correct amount(s) due. I do not believe any debt is owed to the claimed "current" creditor, listed in your notice as "DEUTSCHE BANK NATIONAL TRUST COMPANY in its capacity as indenture trustee for the Noteholders of AAMES MORTGAGE INVESTMENT TRUST 2005-2, a Delaware statutory trust." This is a mortgage-backed security which is not the current holder of the Note or Deed of Trust. Until such time the true beneficiary is known and proven, this debt is invalid.

Further, the assignments of the note and appointments of trustees have not all been recorded in the county recorder's office, as required by ORS 86.735(1), and as the Oregon Court of Appeals ruled in *Niday v. GMAC Mortgage*, (July 18, 2012 Opinion). The Oregon federal district court has also made similar rulings recently in the cases of *Bergquist v. Deutsche Bank National Trust Company*, (August 10, 2012), stating the same claimed "beneficiary" trust company as here is in violation of the Oregon Trust Deed Act (ORS 86.705, et seq), and in particular ORS 86.735(1). The same federal court issued another opinion, also on August 10, 2012, in Lemoss v. Metlilfe Bank, NA, stating the mortgage-backed securities scheme, lack of recordation of all assignments, and other legal problems are apparent – nearly the same set of facts applies here. Not only is the "beneficiary" you claim the debt is owed is incorrect (and not proven), the true beneficiary has not been identified. Further, the complete chain of title is unknown.

1

I hereby demand you verify the disputed debt, validate the correct amount due, and prove the beneficiary and complete chain of title of both the Deed of Trust and Note.

I sent a Notice of Violations of the OTDA, Qualified Written Request, FDCPA Dispute of Debt, etc. on October 14, 2011. You did not respond to that notice. It is attached hereto and is incorporated and relied upon completely herein.

The current and true "Beneficiary" is unknown; until that party proves its standing and authority to attempt to collect on the Note and enforce the sale provisions of the Deed of Trust, there is no "Beneficiary." As such, there is no true and known "Creditor." Because there is no known Creditor, there is no party to which I owe any debt (and certainly not the parties presently seeking to foreclose on a mortgage they do not own or have authority to seek to foreclose or to seek to collect upon an alleged debt which they are not the creditor). Thus, you must remove me from default status.

Any act on behalf of the alleged creditor(s) to enforce a claim against me must be brought before a court, wherein proof of claim is clearly demonstrated by producing acceptable evidence of chain of title, proof of ownership of the mortgage and/or note, establishment of a "true beneficiary," properly recorded documentation and assignments, etc. Your non-judicial foreclosure proceeding is in violation of several provisions of the Oregon Trust Deed Act, as shown in this Notice. You must comply with all the requests herein, the QWR, the Dispute of Debt and Request to Verify as a Valid Debt, and also have notice of grievance and notice of violations of the law. You must take corrective action immediately or I will seek any and all damages available to me under state and federal law, including punitive damages.

## YOUR IMMEDIATE ATTENTION TO THIS MATTER IS REQUIRED.  LACK OF ACTION ON YOUR BEHALF MAY RESULT IN "IMMEDIATE AND IRREPARABLE INJURY, LOSS OR DAMAGE" TO ME BY THE "GRIEVIOUS INJURY" OF THE LOSS OF MY HOME, AND UPON WHICH I WILL SEEK INJUNCTIVE RELEIF

Thank you for your time and professional courtesies.

Dated this 30th day of August, 2012

Ha To Ha

Encl: 10/14/2011 Notice of Violations of OTDA, etc. from Ha to Ha to Regional Trustee Services Corp., et al

2

## *DEMAND TO CANCEL SALE*

### *Ha To Ha*
### *8230 SE Yamhill Street*
### *Portland, OR 97216*

November 9, 2012

Via Fax: 206-299-9720;  Via Cert Mail, Return Receipt Requested No. 7008 0150 0002 4585 0212
Regional Trust Services Corporation
616 1st Avenue, Suite 500
Seattle, Washington 98104

Via Fax: 877-415-5051;  Via Cert Mail, Return Receipt Requested No. 7008 0150 0002 4585 0229
Residential Credit Solutions, Inc.
P O BOX 163889
Fort Worth, TX 76161-3889

### **DEMAND TO IMMEDIATELY CANCEL DECEMBER 10TH, 2012 TRUSTEE'S SALE and NOTICE OF VIOLATIONS OF ORS 86.755(2) and ORS 86.755(12)**

RE:     Trustee's Sale No:       09-FAA-120980
        Loan number:             0004051140
        Property Address:        8230 Yamhill Street, Portland, OR 97216

To Whom it May Concern:

I am writing to inform your companies that you are in violation with **ORS 86.755(2) and ORS 86.755(12)** by continuing the foreclosure proceedings. I demand that you immediately cancel the foreclosure proceedings, for the violations of these laws, as well as all the reasons given in my August 30, 2012 Notice of Dispute of Debt.

This Demand to Cancel Sale only concerns the violations of the laws cited herein, and not the many other issues and violations of law I have previously notified you, and to which you have not responded.

The simple facts show you are in violation of the laws cited, ORS 86.755(2) and ORS 86.755(12). The (operative) Notice of Default was recorded June 21, 2011, setting a sale date of October 27, 2011 (the original sale date). I filed bankruptcy on January 5, 2012 (Case No. 12-30053-tmb13); the bankruptcy was dismissed on May 31, 2012. The (amended) Trustee's Notice of Sale is dated August 7, 2012 setting a sale date of December 10, 2012. Given these dates, you are in violation of both ORS 86.755(2) and ORS 86.755(12).

> **ORS 86.755(2):**
> "The trustee or the attorney for the trustee, or an agent that the trustee or the attorney conducting the sale designates, **may postpone the sale for one or more periods that total not more than 180 days from the original sale date,** giving notice of each adjournment by public proclamation made at the time and place set for sale. The trustee, the attorney or an agent that the trustee or the attorney designates may make the proclamation."

1

**ORS 86.755(12)(a):**
"Notwithstanding subsection (2) of this section, except when a beneficiary has participated in obtaining a stay, foreclosure proceedings that are stayed by order of the court, by proceedings in bankruptcy or for any other lawful reason shall, after release from the stay, **continue as if uninterrupted[1], if within 30 days after release the trustee sends amended notice of sale** by registered or certified mail to the last-known address of the persons listed in ORS 86.740 and 86.750 (1)."

1)  You are in violation of the "180-Day Rule" in ORS 86.755(2).  The original sale date was October 27, 2011.  This date plus 180 days is April 24, 2012.  Including the 147 days in bankruptcy (from January 5, 2012 – May 31, 2012), the latest date a sale could be held under the operative Notice of Default is September 18, 2012.

Here is the calculation:
**10/27/11** (original sale date) + **180 days** = **04/24/12** + **147 days** (in bankruptcy) = **09/18/12**

2)  You are in violation of ORS 86.755(12) because the Trustee's Notice of Sale setting the December 10, 2012 sale date is dated August 7, 2012, and was not sent within 30 days after the release of the bankruptcy (which was May 31, 2012).

I expect you to IMMEDIATELY cancel the December 10, 2012 trustee's sale.  I also am awaiting your response to my dispute of the debt under the FDCPA, as well as the Qualified Written Request under RESPA (see August 30, 2012 letter).  I maintain all the same disputes and issues.

Please also be advised that I am aware of the changes to the Oregon Trust Deed Act concerning 2012 legislation and the passage of Oregon Laws Chapter 112, the foreclosure mediation program. Please review this law and know that I will invoke all the rights and remedies under that law, requiring the "beneficiary" to prove its standing and produce many documents.  The very issues in my August 30, 2012 notice will be at issue (or in a lawsuit should one be filed).

**I hereby demand you to stop the foreclosure sale date of December 10th, 2012.**  I also await the response to my QWR sent on 8/30/12.

**YOUR IMMEDIATE ATTENTION TO THIS MATTER IS REQUIRED.  LACK OF ACTION ON YOUR BEHALF MAY RESULT IN "IMMEDIATE AND IRREPARABLE INJURY, LOSS OR DAMAGE" TO ME BY THE "GRIEVIOUS INJURY" OF THE LOSS OF MY HOME, AND UPON WHICH I WILL SEEK INJUNCTIVE RELEIF AND DAMAGES**

**Thank you,**

**Ha To Ha**

Encl:  8/30/12 QWR- Dispute Of Validity Of Debt

---

[1] Or, the 180-days from the original sale date to hold a "postponed sale" is "uninterrupted" except for the time in bankruptcy (i.e., the time in bankruptcy is added to the 180 days from the original sale date).

* * * Communication Result Report ( Nov. 10. 2012 1:55PM ) * * *

Fax Header) FRED MEYER #128 CSD 503-254-2547

Date/Time: Nov. 10. 2012 1:54PM

| File No. | Mode | Destination | Pg(s) | Result | Page Not Sent |
|---|---|---|---|---|---|
| 0643 | Memory TX | 12062999720 | P. 2 | OK | |

Reason for error
E. 1) Hang up or line fail
E. 2) Busy
E. 3) No answer
E. 4) No facsimile connection
E. 5) Exceeded max. E-mail size

**DEMAND TO CANCEL SALE**

*Ha To Ha*
*8230 SE Yamhill Street*
*Portland, OR 97216*

November 9, 2012

Via Fax: 206-299-9720; Via Cert Mail, Return Receipt Requested No. 7008 0150 0002 4585 0212
Regional Trust Services Corporation
616 1st Avenue, Suite 500
Seattle, Washington 98104

Via Fax: 877-415-5051; Via Cert Mail, Return Receipt Requested No. 7008 0150 0002 4585 0229
Residential Credit Solutions, Inc.
P O BOX 163889
Fort Worth, TX 76161-3889

**DEMAND TO IMMEDIATELY CANCEL DECEMBER 10TH, 2012 TRUSTEE'S SALE and NOTICE OF VIOLATIONS OF ORS 86.755(2) and ORS 86.755(12)**

RE: Trustee's Sale No: 09-FAA-120980
Loan number: 0004051140
Property Address: 8230 Yamhill Street, Portland, OR 97216

To Whom It May Concern:

I am writing to inform your companies that you are in violation with ORS 86.755(2) and ORS 86.755(12) by continuing the foreclosure proceedings. I demand that you immediately cancel the foreclosure proceedings, for the violations of these laws, as well as all the reasons given in my August 30, 2012 Notice of Dispute of Debt.

This Demand to Cancel Sale only concerns the violations of the laws cited herein, and not the many other issues and violations of law I have previously notified you, and to which you have not responded.

The simple facts show you are in violation of the laws cited, ORS 86.755(2) and ORS 86.755(12). The (operative) Notice of Default was recorded June 21, 2011, setting a sale date of October 27, 2011 (the original sale date). I filed bankruptcy on January 5, 2012 (Case No. 12-30053-tmb13); the bankruptcy was dismissed on May 31, 2012. The (amended) Trustee's Notice of Sale is dated August 7, 2012 setting a sale date of December 10, 2012. Given these dates, you are in violation of both ORS 86.755(2) and ORS 86.755(12).

> **ORS 86.755(2):**
> "The trustee or the attorney for the trustee, or an agent that the trustee or the attorney conducting the sale designates, may postpone the sale for one or more periods that total not more than 180 days from the original sale date, giving notice of each adjournment by public proclamation made at the time and place set for sale. The trustee, the attorney or an agent that the trustee or the attorney designates may make the proclamation."

* * * Communication Result Report ( Nov. 10. 2012 1:56PM ) * * *

Fax Header) FRED MEYER #128 CSD 503-254-2547

Date/Time: Nov. 10. 2012 1:55PM

| File No. | Mode | Destination | Pg(s) | Result | Page Not Sent |
|---|---|---|---|---|---|
| 0644 | Memory TX | 18774155051 | P. 2 | OK | |

Reason for error
E. 1) Hang up or line fail
E. 2) Busy
E. 3) No answer
E. 4) No facsimile connection
E. 5) Exceeded max. E-mail size

# DEMAND TO CANCEL SALE

Ha To Ha
8230 SE Yamhill Street
Portland, OR 97216

November 9, 2012

Via Fax: 206-299-9720; Via Cert Mail, Return Receipt Requested No. 7008 0150 0002 4585 0212
Regional Trust Services Corporation
616 1st Avenue, Suite 500
Seattle, Washington 98104

Via Fax: 877-415-5051; Via Cert Mail, Return Receipt Requested No. 7008 0150 0002 4585 0229
Residential Credit Solutions, Inc.
P O BOX 163889
Fort Worth, TX 76161-3889

**DEMAND TO IMMEDIATELY CANCEL DECEMBER 10TH, 2012 TRUSTEE'S SALE and NOTICE OF VIOLATIONS OF ORS 86.755(2) and ORS 86.755(12)**

RE: Trustee's Sale No: 09-FAA-120980
Loan number: 0084051140
Property Address: 8230 Yamhill Street, Portland, OR 97216

To Whom it May Concern:

I am writing to inform your companies that you are in violation with ORS 86.755(2) and ORS 86.755(12) by continuing the foreclosure proceedings. I demand that you immediately cancel the foreclosure proceedings, for the violations of these laws, as well as all the reasons given in my August 30, 2012 Notice of Dispute of Debt.

This Demand to Cancel Sale only concerns the violations of the laws cited herein, and not the many other issues and violations of law I have previously notified you, and to which you have not responded.

The simple facts show you are in violation of the laws cited, ORS 86.755(2) and ORS 86.755(12). The (operative) Notice of Default was recorded June 21, 2011, setting a sale date of October 27, 2011 (the original sale date). I filed bankruptcy on January 5, 2012 (Case No. 12-30058-tmb13); the bankruptcy was dismissed on May 31, 2012. The (amended) Trustee's Notice of Sale is dated August 7, 2012 setting a sale date of December 10, 2012. Given these dates, you are in violation of both ORS 86.755(2) and ORS 86.755(12).

> ORS 86.755(2):
> "The trustee or the attorney for the trustee, or an agent that the trustee or the attorney conducting the sale designates, may postpone the sale for one or more periods that total not more than 180 days from the original sale date, giving notice of each adjournment by public proclamation made at the time and place set for sale. The trustee, the attorney or an agent that the trustee or the attorney designates may make the proclamation."

April 25, 2013

Regional Trustee Services Corporation          VIA FAX: **206-292-4930**
616 1st Avenue, Suite 500
Seattle, WA 98104

## DISPUTE UNDER FEDERAL FAIR DEBT COLLECTION PRACTICES ACT

RE:   Trustee's Sale No:      09-FAA-125783
      Property Address:        8230 Yamhill Street, Portland, OR 97216
      Property Owner:          Ha To Ha

To Whom it May Concern:

I am in receipt of your March 29, 2013 Notice required by the Federal Fair Debt Collection Practices Act, 15 U.S.C. § 1692 ("FDCPA"). I am hereby giving official Notice of Dispute of the Validity of a Debt and Request to Verify Debt under the provisions of the FDCPA governing disputes of debts.

I dispute the validity of the amount of the alleged debt as being $261,531.08. This amount is incorrect. I dispute that any debt is owed to the claimed "current" creditor, listed in your notice as "DEUTSCHE BANK NATIONAL TRUST COMPANY in its capacity as indenture trustee for the Noteholders of AAMES MORTGAGE INVESTMENT TRUST 2005-2, a Delaware stator trust." This is a mortgage-backed security which is not the current holder of the Note or Deed of Trust. Until such time the true beneficiary is known and proven, this debt is invalid.

There are many other issues I have previously raised, and will continue to challenge this debt. Please respond accordingly.

As you are aware, the sale date of April 26, 2013 has been cancelled by the filing of the Chapter 7 bankruptcy, U.S. Bankruptcy Court Case No.13-32107-elp7 filed April 8, 2013. Please be advised I will seek damages for any actions taken in violation of all Oregon state non-judicial foreclosure laws, federal laws, including the FDCPA (and RESPA, which you have still failed to respond adequately).

Thank you for your time and professional courtesies.

*Ha To Ha*
*8230 SE Yamhill Street*
*Portland, OR 97216*

cc: Robinson Tait for Residential Credit Solutions, Inc. (via fax: **206-676-9659**)

* * * Communication Result Report ( Apr. 27. 2013 12:36PM ) * * *

Fax Header) FRED MEYER #128 CSD 503-254-2547

Date/Time: Apr. 27. 2013 12:35PM

| File No. | Mode | Destination | Pg(s) | Result | Page Not Sent |
|---|---|---|---|---|---|
| 3680 | Memory TX | 12066769659 | P. 1 | OK | |

Reason for error
E. 1) Hang up or line fail
E. 2) Busy
E. 3) No answer
E. 4) No facsimile connection
E. 5) Exceeded max. E-mail size

April 25, 2013

Regional Trustee Services Corporation
616 1st Avenue, Suite 500
Seattle, WA 98104

VIA FAX: 206-292-4930

**DISPUTE UNDER FEDERAL FAIR DEBT COLLECTION PRACTICES ACT**

RE: Trustee's Sale No: 09-FAA-125783
Property Address: 8230 Yamhill Street, Portland, OR 97216
Property Owner: Ha To Ha

To Whom it May Concern:

I am in receipt of your March 29, 2013 Notice required by the Federal Fair Debt Collection Practices Act, 15 U.S.C. § 1692 ("FDCPA"). I am hereby giving official Notice of Dispute of the Validity of a Debt and Request to Verify Debt under the provisions of the FDCPA governing disputes of debts.

I dispute the validity of the amount of the alleged debt as being $261,531.08. This amount is incorrect. I dispute that any debt is owed to the claimed "current" creditor, listed in your notice as "DEUTSCHE BANK NATIONAL TRUST COMPANY in its capacity as indenture trustee for the Noteholders of AAMES MORTGAGE INVESTMENT TRUST 2005-2, a Delaware stator trust." This is a mortgage-backed security which is not the current holder of the Note or Deed of Trust. Until such time the true beneficiary is known and proven, this debt is invalid.

There are many other issues I have previously raised, and will continue to challenge this debt. Please respond accordingly.

As you are aware, the sale date of April 26, 2013 has been cancelled by the filing of the Chapter 7 bankruptcy, U.S. Bankruptcy Court Case No.13-32107-elp7 filed April 8, 2013. Please be advised I will seek damages for any actions taken in violation of all Oregon state non-judicial foreclosure laws, federal laws, including the FDCPA (and RESPA, which you have still failed to respond adequately).

Thank you for your time and professional courtesies.

*Ha To Ha*
*8230 SE Yamhill Street*
*Portland, OR 97216*

cc: Robinson Tait for Residential Credit Solutions, Inc. (via fax: 206-676-9659)

* * * Communication Result Report ( Apr. 27. 2013 12:35PM ) * * *

Fax Header) FRED MEYER #128 CSD 503-254-2547

Date/Time: Apr. 27. 2013 12:35PM

| File No. | Mode | Destination | Pg(s) | Result | Page Not Sent |
|---|---|---|---|---|---|
| 3679 | Memory TX | 12062924930 | P. 1 | OK | |

Reason for error
E. 1) Hang up or line fail
E. 2) Busy
E. 3) No answer
E. 4) No facsimile connection
E. 5) Exceeded max. E-mail size

April 25, 2013

Regional Trustee Services Corporation
616 1st Avenue, Suite 500
Seattle, WA 98104

VIA FAX: 206-292-4930

**DISPUTE UNDER FEDERAL FAIR DEBT COLLECTION PRACTICES ACT**

RE: Trustee's Sale No: 09-FAA-125783
Property Address: 8230 Yamhill Street, Portland, OR 97216
Property Owner: Ha To Ha

To Whom it May Concern:

I am in receipt of your March 29, 2013 Notice required by the Federal Fair Debt Collection Practices Act, 15 U.S.C. § 1692 ("FDCPA"). I am hereby giving official Notice of Dispute of the Validity of a Debt and Request to Verify Debt under the provisions of the FDCPA governing disputes of debts.

I dispute the validity of the amount of the alleged debt as being $261,531.08. This amount is incorrect. I dispute that any debt is owed to the claimed "current" creditor, listed in your notice as "DEUTSCHE BANK NATIONAL TRUST COMPANY in its capacity as indenture trustee for the Noteholders of AAMES MORTGAGE INVESTMENT TRUST 2005-2, a Delaware stator trust." This is a mortgage-backed security which is not the current holder of the Note or Deed of Trust. Until such time the true beneficiary is known and proven, this debt is invalid.

There are many other issues I have previously raised, and will continue to challenge this debt. Please respond accordingly.

As you are aware, the sale date of April 26, 2013 has been cancelled by the filing of the Chapter 7 bankruptcy, U.S. Bankruptcy Court Case No.13-32107-elp7 filed April 8, 2013. Please be advised I will seek damages for any actions taken in violation of all Oregon state non-judicial foreclosure laws, federal laws, including the FDCPA (and RESPA, which you have still failed to respond adequately).

Thank you for your time and professional courtesies.

*Ha To Ha*
*8230 SE Yamhill Street*
*Portland, OR 97216*

cc: Robinson Tait for Residential Credit Solutions, Inc. (via fax: 206-676-9659)

# Exhibit 9



December 13, 2012

HA TO HA
8230 SE YAMHILL STREET
PORTLAND, OR 97216

Re: Loan Number: 4051140

Dear Mr. Ha:

This letter is in response to the correspondence received by Residential Credit Solutions, Inc. (RCS) for the loan referenced above.

Our records reflect that there is an active Chapter 13 Bankruptcy in effect for this account. Due to this reason, foreclosure action has been suspended in accordance with applicable law.

If you need further assistance, please contact us at (800) 737-1192. Our Customer Service Representatives are available Monday through Thursday between 7:00 a.m. and 11:00 p.m., Friday between 7:00 a.m. and 9:00 p.m. and Saturday, between 8:00 a.m. and 2:00 p.m. Central Time.

Thank you,
Research Department
Residential Credit Solutions, Inc.

NOTICE: If you have received a Chapter 7 bankruptcy discharge, Residential Credit Solutions, Inc. recognizes that the discharge relieves you of all personal liability on the loan. This is not an attempt to collect this debt from you personally. We are in no way attempting to revive your personal liability on your obligation. We do retain the right, however, despite the discharge, to enforce our security interest against the property by foreclosing if a default exists.

Residential Credit Solutions is a debt collector; any information obtained may be used for this purpose.

OL0803                  Residential Credit Solutions, Inc.
                        P.O. Box 163889, Ft Worth, TX 76161-3889
                        Website: www.residentialcredit.com

 RCS

09/17/12

HA TO HA
8230 SE YAMHILL STREET
PORTLAND        OR  97216

Re: RCS Loan Number: 0004051140

Dear Customer(s):

Residential Credit Solutions, Inc. ("RCS") is in receipt of your Qualified Written Request for the above referenced loan.

This letter is to confirm that we are currently researching your request. Please allow up to 20 business days for us to complete our research and respond to your request. We appreciate your patience and understanding while we research your request.

If you should have any questions, please contact us at (800) 737-1192. Our Customer Service Representatives are available Monday through Thursday between 7:00 a.m. and 11:00 p.m., Friday between 7:00 a.m. and 9:00 p.m. and Saturday, between 8:00 a.m. and 2:00 p.m., Central Time.

Sincerely,
Customer Relations
Residential Credit Solutions, Inc.

NOTICE: If you have received a Chapter 7 bankruptcy discharge, Residential Credit Solutions, Inc. recognizes that the discharge relieves you of all personal liability on the loan. This is not an attempt to collect this debt from you personally. We are in no way attempting to revive your personal liability on your obligation. We do retain the right, however, despite the discharge, to enforce our security interest against the property by foreclosing if a default exists.

**Residential Credit Solutions is a debt collector; any information obtained may be used for this purpose.**

OL0265



09/17/12

HA TO HA
8230 SE YAMHILL STREET
PORTLAND          OR 97216

*20 big days from 9/17/12 is 10/15/12 didn't received any letter until 12/13/12*



Re: RCS Loan Number: 0004051140

Dear Customer(s):

Residential Credit Solutions, Inc. ("RCS") is in receipt of your Qualified Written Request for the above referenced loan.

This letter is to confirm that we are currently researching your request. Please allow up to 20 business days for us to complete our research and respond to your request. We appreciate your patience and understanding while we research your request.

If you should have any questions, please contact us at (800) 737-1192. Our Customer Service Representatives are available Monday through Thursday between 7:00 a.m. and 11:00 p.m., Friday between 7:00 a.m. and 9:00 p.m. and Saturday, between 8:00 a.m. and 2:00 p.m., Central Time.

Sincerely,
Customer Relations
Residential Credit Solutions, Inc.

NOTICE: If you have received a Chapter 7 bankruptcy discharge, Residential Credit Solutions, Inc. recognizes that the discharge relieves you of all personal liability on the loan. This is not an attempt to collect this debt from you personally. We are in no way attempting to revive your personal liability on your obligation. We do retain the right, however, despite the discharge, to enforce our security interest against the property by foreclosing if a default exists.

**Residential Credit Solutions is a debt collector; any information obtained may be used for this purpose.**

OL0265



09/27/12                                                                                                      1

HA TO HA
8230 SE YAMHILL STREET
PORTLAND          OR  97216



Re: RCS Loan Number: 0004051140

Dear Customer(s):

Residential Credit Solutions, Inc. ("RCS") is in receipt of your Qualified Written Request for the above referenced loan.

This letter is to confirm that we are currently researching your request. Please allow up to 20 business days for us to complete our research and respond to your request. We appreciate your patience and understanding while we research your request.

If you should have any questions, please contact us at (800) 737-1192. Our Customer Service Representatives are available Monday through Thursday between 7:00 a.m. and 11:00 p.m., Friday between 7:00 a.m. and 9:00 p.m. and Saturday, between 8:00 a.m. and 2:00 p.m., Central Time.

Sincerely,
Customer Relations
Residential Credit Solutions, Inc.


NOTICE: If you have received a Chapter 7 bankruptcy discharge, Residential Credit Solutions, Inc. recognizes that the discharge relieves you of all personal liability on the loan. This is not an attempt to collect this debt from you personally. We are in no way attempting to revive your personal liability on your obligation. We do retain the right, however, despite the discharge, to enforce our security interest against the property by foreclosing if a default exists.

**Residential Credit Solutions is a debt collector; any information obtained may be used for this purpose.**

OL0265

This was forwarded by
Trustee via email on
10/10/2011
Didn't received this
one but a similar
one with same date
to their different
loan #.



September 22, 2011

Ha to Ha
8230 SE Yamhill Street
Portland, OR 97216

Re: Loan Number: 4051140

Dear Mr. Ha:

This letter is in response to the correspondence received by Residential Credit Solutions, Inc. ("RCS") for the loan referenced above.

Although your letter is captioned as a Qualified Written Request (as defined under RESPA Sec. 6), it is our determination that it does not qualify for such treatment, as we cannot find reference to a specific allegation of inaccurate servicing. See: *Kee v. Fifth Third Bank*, 2009 WL 735048 (D. Utah Mar. 18, 2009), MorEquity, *Inc. v. Naeem*, 118 F.Supp.2d 885, 901 (N.D. Ill. 2000); *Harris v. American General Finance Inc.*, 2005 US Dist. Lexis 33260 (D. Kan. July 6, 2005), (aff'd 10th Cir. Dec. 18, 2007). See also: HUD commentary at 59 Fed. Reg. 65,442, 65,445 (Dec. 19, 1994). Your letter is in the form of a request for production of documents or an interrogatory. Because we are not involved in litigation with respect to you or this account, we are not obligated to comply with such a demand.

If you are questioning a specific event with respect to this account, or have a specific allegation of improper servicing, please advise us of such in a letter. Please note that while most requests relating to payments, escrow accounts and related matters are typically handled at no charge, we reserve the right to charge for our legal staff's time ($85/hour) in complying with more complex requests under Section 6. See: *Smith v. Chase Manhattan Mortgage Corp.*, 222 Fed. Appx. 533 (8th Cir. 2007); *Curran v. Washington Mut. Bank*, 471 F3d 857 (8th Cir. 2006); *Watt v. GMAC Mortgage Corp.*, 457 F3d 781 (8th Cir. 2006).

Notwithstanding the foregoing, Residential Credit Solutions aggressively seeks and acts upon opportunities to assist our borrowers and clients and we would be happy to answer specific questions about the account and to direct our efforts to solving any problems, as appropriate.

OL0803                    Residential Credit Solutions, Inc.
                  PO Box 163889, Fort Worth, TX 76161-3889
                      Website: www.residentialcredit.com

We have enclosed a copy of the payment history for the time the loan has been serviced by Residential Credit Solutions for your reference.   This document provides detailed information with respect to the accrual and application of principal and interest as well as property tax and insurance payments and corporate advances as applicable.

If you need further assistance, please contact us at (800) 737-1192. Our Customer Service Representatives are available Monday through Thursday between 7:00 a.m. and 11:00 p.m., Friday between 7:00 a.m. and 9:00 p.m. and Saturday, between 7:00 a.m. and 1:00 p.m., and Sunday between 4:00 p.m. and 9:00 p.m., Central Time.

Respectfully,
Research Department
Residential Credit Solutions, Inc.



September 22, 2011

CHRIS WALLACE
4211 CLEARVIEW DR
DOUGLASVILLE, GA 30134

Re: Loan Number: 2100015828

Dear Mr. Wallace:

This letter is in response to the correspondence received by Residential Credit Solutions, Inc.
(RCS) for the loan referenced above.

Although your letter is captioned as a Qualified Written Request (as defined under Real
Estate Settlement Procedures Act ("RESPA") Sec. 6), it is our determination that it does not
qualify for such treatment, as we cannot find reference to a specific allegation of inaccurate
servicing. RCS is required by RESPA to provide information regarding the servicing of the
loan or respond to a statement about why you think the servicing of the account is in error.
Servicing is defined very narrowly in RESPA to be the receipt of scheduled payments and
attributing those payments to principal and interest, escrow, and otherwise as required by the
note.

If you are questioning a specific event with respect to this account, or have a specific
allegation of improper servicing, please advise us of such in a letter. A copy of your payment
history has been enclosed in the hopes it will answer any specific servicing question you may
have. A payoff quote has also been included, pursuant to your request.

If you need further assistance, please contact us at (800) 737-1192. Our Customer Service
Representatives are available Monday through Thursday between 7:00 a.m. and 11:00 p.m.,
Friday between 7:00 a.m. and 9:00 p.m. and Saturday, between 8:00 a.m. and 2:00 p.m.
Central Time.


Thank you,
Research Department
Residential Credit Solutions, Inc.


OL0804                    Residential Credit Solutions, Inc.
                    PO Box 163889, Fort Worth, TX 76161-3889
                    Website: www.residentialcredit.com



Fiserv (DISPLAY/HIST/CUST LETTER) - Print Ready                                    Page 1 of 6



DATE            9/22/2011
PAGE               1
LOAN NUMBER    2100013828

MORTGAGOR MAILING ADDRESS
CHRIS WALLACE

4211 CLEARVIEW DR

DOUGLASVILLE GA 30134
PROPERTY ADDRESS
4211 CLEARVIEW DR

DOUGLASVILLE GA 30134

| PAYMENT INFORMATION | | ORIGINAL INFORMATION | | YEAR-TO-DATE | |
|---|---|---|---|---|---|
| P&I PAYMENT | 543.39 | ORIG BAL | 99,632.00 | INT PAID | 3,851.70 |
| ESCROW | 140.62 | ORIGINAL RATE | 5.000 | NEG AMORT | 0.00 |
| OPTIONAL INS | 0.00 | LOAN TERM | 531 | TAX PAID | 0.00 |
| BUYDOWN | 0.00 | FIRST DUE DATE | 01/01/06 | INT ON ESCROW | 0.00 |
| ASSISTANCE AMT | 0.00 | LOAN TYPE | CONV | UNCOLLECTED BALANCES | |
| ANCILLARY | 0.00 | CURRENT RATE | 6.000 | NSF FEES | 0.00 |
| TOTAL PAYMENT | 684.01 | | | LATE CHARGES | 278.90 |
| UNAPL FUNDS | 1,774.77 | NEXT DUE DATE | 06/01/11 | FEES | 28.45 |
| | | PAID TO DATE | 05/01/11 | INTEREST | 0.00 |
| | | | | TOTALS | 307.35 |

DETAIL BY TRANSACTION

| EFF DATE | TOTAL AMT | PRIN AMT | ESCROW AMT | FEE AMT | DESCRIPTION |
|---|---|---|---|---|---|
| PD TO DT | UNAPPLIED AMT | INT AMT | OPT AMT | LT CHG | PRIN BAL AFT |
| 09/16/11 | 13.50 | 0.00 | 0.00 | 13.50 | FEE BILLED |
| 05/11 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 08/22/11 | 13.50 | 0.00 | 0.00 | 13.50 | FEE BILLED |
| 05/11 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 08/10/11 | 0.00 | 0.00 | 8.00 | 0.00 | ADJUSTMENT |
| 05/11 | 0.00 | 0.00 | 0.00 | 0.00 | 98042.34 |
| 08/10/11 | 0.00 | 0.00 | 0.00 | 0.00 | ADJUSTMENT |
| 05/11 | 0.00 | 0.00 | 0.00 | 0.00 | 98042.34 |
| 08/10/11 | -301.67 | 0.00 | 0.00 | 0.00 | UNAPPLIED |
| 05/11 | -301.67 | 0.00 | 0.00 | 0.00 | 98042.34 |
| 08/10/11 | 301.67 | 0.00 | 0.00 | 0.00 | UNAPPLIED |
| 05/11 | 301.67 | 0.00 | 0.00 | 0.00 | 98042.34 |
| 08/10/11 | 0.00 | 0.00 | 0.00 | 0.00 | ADJUSTMENT |
| 05/11 | 0.00 | 0.00 | 0.00 | 162.96 | 98042.34 |



EXHIBIT   H
PAGE  5  OF  5

# Exhibit 10

# robinson | tait, p.s.
## attorneys at law

Jennifer L. Tait WA/ID/OR
John A. "Joe" Solseng WA/AK/AZ/CA/MT/NV
Maya Anderson WA
Ryan M. Carson WA
Nicolas Daluiso WA/CA

Lisa McMahon-Myhran WA/OR
Craig Peterson WA
Rhonna Kollenkark WA
Wesley J. Werich WA

November 12, 2012

Ha To Ha
8230 SE Yamhill Street
Portland, OR 97216

> Re: 8230 Yamhill Street, Portland, OR 97216
> Loan no. 0004051140

Dear Mr. Ha:

Please be advised that the undersigned represents Residential Credit Solutions, Inc. (RCS) in this matter. This letter is in response to your August 30, 2012 letter requesting information regarding the above referenced loan and referencing your previous October 14, 2011 letter.

In regard to the October 14, 2011 letter, while you have designated a portion of the correspondence as a qualified written request ("QWR") under the Real Estate Settlement and Procedures Act ("RESPA"), "Not all requests that relate to the loan are related to the servicing of the loan." *Williams v. Wells Fargo*, No. 10-0399, 2010 U.S. Dist. LEXIS 36247, 2010 WL 1463521, at *3 (N.D. Cal. Apr. 13, 2010). "A loan servicer only has a duty to respond if the information request is related to loan servicing." *Copeland v. Lehman Bros. Bank, FSB*, No. 09-1774, 2010 U.S. Dist. LEXIS 73032, 2010 WL 2817173, at *3 (S.D. Cal. July 15, 2010). Section 35100.21(e)(2) of RESPA is intended to provide a borrower with a method of challenging a specific error in the servicing of the loan. RCS is not required to include information outside the scope of servicing in its response to a QWR.

From your October 14, 2011 letter, it is unclear what specific error you are attributing to the servicer of your loan. Without identifying the specific error, RCS is unable to respond pursuant to RESPA.

In regard to your August 30, 2012 letter, under the Federal Debt Collection Practices Act ("FDCPA"), RCS is required to provide you verification of the debt. As such, enclosed please find a copy of the original Note and Deed of Trust and Loan Modification Agreement executed by you, as well as the Assignment of your Deed of Trust, a payoff history, a reinstatement quote and a payoff quote. Please also note, the original lender on your Note and beneficiary of your Deed of Trust was Aames Funding Corporation dba Aames Home Loans. The current lender and beneficiary is Deutsche Bank National Trust Company in its capacity as indenture trustee for the Noteholders of Aames Mortgage Investment Trust 2005-2, a Delaware statutory trust.

November 12, 2012
Page 2

Please feel free to contact me with any questions or concerns.

Thank you,

Nicolas A. Daluiso

# Exhibit 11

```
<DOCUMENT>
<TYPE>15-15D
<SEQUENCE>1
<FILENAME>ami05002_15-2005.txt
<TEXT>
```

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, D.C. 20549


FORM 15


Certification and Notice of Termination of Registration under Section
12(g) of the Securities Exchange Act of 1934 or Suspension of Duty to
File Reports under Sections 13 and 15(d) of the Securities Exchange Act
of 1934.


Commission File Number:  333-118926-25


  Aames Mortgage Investment Trust
  Mortgage-Backed Notes,
  Series 2005-2  Trust

(Exact name of Registrant as specified in its charter)


  c/o Wells Fargo Bank, N.A.
  9062 Old Annapolis Road
  Columbia, MD 21045
  (410) 884-2000


   (Address, including zip code, and telephone number, including area code,
   of Registrant's principal executive offices)

1A1

1A2

1A3

2A1

B1

B2

B3

B4

M1

M2

M3

M4

M5

M6

M7

M8

M9

OC

(Title of each class of securities covered by this Form)

   None

(Titles of all other classes of securities for which a duty to file
reports under Section 13(a) or 15(d) remains)


Please place an X in the box(es) to designate the appropriate rule
provision(s) relied upon to terminate or suspend the duty to file reports:

   Rule 12g-4(a)(1)(i)          / /

   Rule 12g-4(a)(1)(ii)         / /

   Rule 12g-4(a)(2)(i)          / /

   Rule 12g-4(a)(2)(ii)         / /

   Rule 15d-6                   /X/

   Rule 12h-3(b)(1)(i)          /X/

   Rule 12h-3(b)(1)(ii)         / /

   Rule 12h-3(b)(2)(i)          / /

   Rule 12h-3(b)(2)(ii)         / /


Approximate number of holders of record as of the certification or notice
date:
          Less than 300 Holders



Pursuant to the requirements of the Securities Exchange Act of 1934,

   Aames Mortgage Investment Trust
   Mortgage-Backed Notes,
   Series 2005-2  Trust

has caused this certification/notice to be signed on its behalf by the
undersigned duly authorized person.


Date: 01/19/2006
By: /s/ Beth Belfield, Officer


Instruction: This form is required by Rules 12g-4, 12h-3 and 15d-6 of
the General Rules and Regulations under the Securities Exchange Act of
1934. The Registrant shall file with the Commission three copies of
Form 15, one of which shall be manually signed. It may be signed by an
officer of the Registrant, by counsel or by any other duly authorized
person. The name and title of the person signing the form shall be
typed or printed under the signature.


</TEXT>
</DOCUMENT>

1  PRESTON DUFAUCHARD
   CALIFORNIA CORPORATIONS COMMISSIONER
2  WAYNE STRUMPFER
   DEPUTY COMMISSIONER
3  ALAN S. WEINGER (CA BAR NO. 86717)
   SUPERVISING ATTORNEY
4  320 WEST 4th STREET. SUITE 750
   LOS ANGELES. CALIFORNIA 90013-1105
5
6  Attorneys for Complainant

7                 BEFORE THE DEPARTMENT OF CORPORATIONS

8                      OF THE STATE OF CALIFORNIA

9

10 In the Matter of the Accusation of        )   File No. 4130295
                                             )
11 THE CALIFORNIA CORPORATIONS               )
   COMMISSIONER.                             )
12                                           )
                                             )
13            Complainant,                   )
                                             )
14     vs.                                   )
                                             )
15                                           )
                                             )
16                                           )
   AAMES HOME LOAN, THE CENTER FOR           )
17 LOAN SERVICING (AAMES FUNDING             )
   CORPORATION, DBA), Respondent
18

19

20                      ORDER SUMMARILY REVOKING
21        RESIDENTIAL MORTGAGE LENDER AND/OR SERVICER LICENSE

22

23      THE CALIFORNIA CORPORATIONS COMMISSIONER FINDS THAT:

24      GOOD CAUSE APPEARING, the license issued AAMES HOME LOAN, THE CENTER

25 FOR LOAN SERVICING (AAMES FUNDING CORPORATION, DBA) is hereby revoked for

26 failure to comply with Section 50401 of the California Residential Mortgage Lending Act which

27 requires the payment of an assessment to the Commissioner.

28

1

2    Dated:         November 5, 2007
3    Effective:     December 6, 2007
               Los Angeles, California

4

5                                  PRESTON DUFAUCHARD
                              CALIFORNIA CORPORATIONS COMMISSIONER
6

7

8                        By_____
                              DIAUN M. BURNS
9                              Special Administrator
                              California Residential Mortgage Lending Act
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                    --                                    2

**CERTIFICATE OF SERVICE**

June 4

I hereby certify that on May____ 2013, we mailed a true and correct copy of the above and foregoing motion to the parties listed below.

Jessica P. Sam
Ha To Ha

Lawyers for :
Robinson Tait
710 Second Avenue
Suite 710
Seattle, WA 98104